*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| STEPHAN C. MITCHELL, | ) | |
| | ) | Supreme Court No. S-17678 |
| Appellant, | ) | |
| | ) | Alaska Workers' Compensation |
| v. | ) | Appeals Commission No. 18-009 |
| | ) | |
| UNITED PARCEL SERVICE and | ) | O P I N I O N |
| LIBERTY MUTUAL FIRE | ) | |
| INSURANCE COMPANY, | ) | No. 7566 – November 12, 2021 |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Alaska Workers' Compensation Appeals Commission.

Appearances: Richard L. Harren and H. Lee, Law Offices of Richard L. Harren, P.C., Wasilla, for Appellant. Nora G. Barlow, Barlow Anderson, LLC, Anchorage, for Appellees.

Before: Bolger, Chief Justice, Winfree, Maassen, Carney, and Borghesan, Justices.

BORGHESAN, Justice.

## I.      INTRODUCTION

This appeal from the Alaska Workers' Compensation Appeals Commission raises two issues. The first issue is whether the employer rebutted the presumption that the worker was permanently and totally disabled between 2004 and 2017 due to a back injury. Determining disability entails two factors: the worker's limitations and the

existence of jobs the worker can perform in light of those limitations. Because the employer in this case failed to produce evidence of jobs that could accommodate the worker's limitations, the employer failed to rebut the presumption that he was disabled.

The second issue is whether the worker is entitled to compensation for a back surgery obtained without prior approval. Because the surgery did not yield long-term pain relief or functional improvement and because it entailed using a medical device in a way that the U.S. Food and Drug Administration (FDA) had specifically warned was not established as safe or effective, it was not an abuse of discretion to deny reimbursement.

## II.     FACTS AND PROCEEDINGS

This appeal represents the culmination of more than 20 years of litigation before the Alaska Workers' Compensation Board. Because of the lengthy and complicated history of the case, we provide a very brief overview.

Stephan "Craig" Mitchell[1] suffered a work-related back injury in 1995. Since that time he has had continuing back pain and has received numerous medical interventions to try to treat the pain, including several surgeries. One of these surgeries, a 2006 procedure that entailed implanting a device adjacent to the spine in order to stabilize it, Mitchell paid for himself after his employer refused to pay for it. Mitchell filed a claim with the Board, asking it to order his employer, United Parcel Service (UPS), to reimburse him for the surgery.

In the years after his injury, Mitchell engaged in retraining but did not find suitable work. In 2009 the Social Security Administration decided Mitchell was eligible

---

[1]     Mitchell's first name is spelled both "Stephen" and "Stephan" in the record. We use "Stephan," as that was the spelling used on his initial injury report.

for Social Security Disability effective April 1, 2004. Relying on this decision, Mitchell then filed a workers' compensation claim for permanent total disability as of that date.

After many delays and evaluations by medical professionals, the Board ruled that Mitchell was not permanently and totally disabled until 2017 (the date of one of his medical evaluations). The Board rejected Mitchell's claim of reimbursement for the surgery, concluding the procedure was not reasonable or necessary. The Commission affirmed, and Mitchell now appeals these two rulings to us.

### A.    1995-1998:  Injury Through Initial Reemployment Efforts

On October 31, 1995, Mitchell reported back pain, which he related to driving a truck for UPS. UPS accepted Mitchell's claim and began to pay him temporary total disability benefits. Mitchell's back pain was first treated with conservative care; but when that did not alleviate the pain, Mitchell's doctor, Dr. Byron Perkins, referred Mitchell for a surgical consultation. A doctor who examined Mitchell at UPS's request agreed surgery was a good option.

Mitchell had his first lumbar surgery in February 1996, but the surgery did not completely eliminate his pain. That July Dr. Perkins told UPS that Mitchell would not be able to return to work as a truck driver, and UPS's medical evaluator agreed. UPS then requested a reemployment evaluation for Mitchell. Dr. Perkins said Mitchell was medically stable in late 1996. The doctor who examined Mitchell for UPS rated him as having a 10% whole person impairment in December 1996.

Mitchell was found eligible for reemployment benefits in early January 1997 after Dr. Perkins disapproved job descriptions for Mitchell's past work.[2] Mitchell selected Carol Jacobsen of Northern Rehabilitation Services, Inc. (NRS) to work with

---

[2]    *See* AS 23.30.041(e) (setting out eligibility criteria, including use of U.S. Department of Labor's Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO) for physical demands of jobs).

him on the reemployment plan. Mitchell earned $21.06 an hour at the time of his injury, so his remunerative wage was $12.64 an hour.[3] Mitchell was a union member, and both he and NRS contacted the union for employment information during the reemployment process.

For Mitchell's reemployment plan, he and NRS initially identified three occupational goals in the trucking industry. NRS told UPS in a status report that the job market for the selected positions and for the trucking industry as a whole was "sluggish"; a later report said one position had only "limited availability within the local labor market." In light of this information, Mitchell agreed to consider clerical positions outside the trucking industry as a stop-gap reemployment goal as well.

As part of the reemployment process NRS prepared two labor market surveys in 1997: one for "Motor Vehicle Dispatcher," and "Traffic Rate Clerk," two jobs in the trucking industry classified as "sedentary" in the U.S. Department of Labor's Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO); and one for "Administrative Clerk," classified as "light."[4] The "Motor Vehicle Dispatcher, Traffic Rate Clerk" survey showed that NRS contacted nine companies, none of which had openings at the time, and that positions had wages

---

[3]    *See* AS 23.30.041(r)(7) (defining "remunerative employability" in retraining as allowing employee to earn at least 60% of employee's gross hourly wages at time of injury).

[4]    The SCO uses nine-digit occupational codes from the Dictionary of Occupational Titles and provides a summary of the physical demands and vocational requirements of jobs listed in that reference. U.S. DEP'T OF LAB., SELECTED CHARACTERISTICS OF OCCUPATIONS DEFINED IN THE REVISED DICTIONARY OF OCCUPATIONAL TITLES, at v, E-1 (1993) [hereinafter SCO]. The Dictionary of Occupational Titles has job descriptions for various occupations, assigning each occupation a unique code. *See* 1 U.S. DEP'T OF LAB., DICTIONARY OF OCCUPATIONAL TITLES, at xv (4th ed. 1991) [hereinafter DOT].

"of approximately $10.00 per hour to start" for non-union jobs. An online search showed 62 openings nationwide for motor vehicle dispatcher and 7 for traffic rate clerk. Nonetheless NRS "found positions do exist in the Anchorage area" for the two sedentary positions and concluded there was "a viable labor market" for those jobs. Dr. Perkins approved the Dictionary of Occupational Titles (DOT) job descriptions for these two positions in April 1997.

The labor market survey for "Administrative Clerk" showed a much larger job market, although the average wage was "[l]ow." According to NRS's research, "approximately 11,020 Administrative Clerks [were] employed" in Alaska and "work in every sector of the economy." NRS contacted seven employers in Anchorage and reported "a minimum of 2025 individuals" were then "employed as Administrative Clerks." NRS concluded there was "a viable labor market" for this position. In May Dr. Perkins approved the DOT job description for "Administrative Clerk."

After completing the reemployment plan in 1998, Mitchell worked for a period of time as a surveyor in spite of Dr. Perkins's earlier opinion that this job exceeded his physical capacities; he also cleaned ice rinks for a school district for a short time. Mitchell engaged in outdoor recreational activities such as snowmachining, and (with help at times) hunting and fishing, and he volunteered for a neighborhood patrol. Mitchell saw Dr. Perkins regularly in 1998 for back pain, with specific episodes linked to work as a surveyor and to recreational activities. Dr. Perkins observed in a November 1998 chart note that Mitchell's increased use of pain medication and muscle relaxants "correlates to the time when [he] returned to work as a land surveyor."

### B. 1998-2001: Additional Surgeries And Further Reemployment Efforts

In November 1998 Mitchell asked to "reopen" his reemployment file because of the plan's change in focus and because the fields for which he was retrained, identified by Mitchell as "office assistant or bookkeeper," did not offer "a salary range

even close to the 60% target of rehab."[5] In January 1999 NRS performed another labor market survey for "Motor Vehicle Dispatcher/Traffic Rate Clerk."[6] NRS contacted ten companies and "learned . . . there [were] 33 people currently employed as Motor Vehicle Dispatchers and/or Rate Clerks" at those ten companies; a supplement included another employer, who employed six dispatchers but had "no current or anticipated openings."[7] NRS also talked to a union representative, who said he had "not dispatched any Rate Clerks in at least four years," had not dispatched a "Dispatcher" in about 25 years, but had "dispatched 12 to 15 general [clerical workers] . . . over the past 7 years." NRS then developed a plan addendum with the same employment goals (including Administrative Clerk), which Mitchell and UPS signed in April 1999.

Mitchell underwent a second lumbar surgery in October 1999, which interrupted his retraining. Mitchell's surgeon, Dr. Davis Peterson, released him to start a planned externship, subject to restrictions on some activities such as sitting, in late

---

[5] *See* AS 23.30.041(r)(7) (defining remunerative employability); *cf. Rockney v. Boslough Constr. Co.*, 115 P.3d 1240, 1242-43 (Alaska 2005) (reversing Board decision that used wage for experienced drafter rather than entry-level wage for that occupation because the evidence did not support a finding that the wages were remunerative).

[6] NRS stated in a later document that it also updated the labor market survey for the administrative clerk position, but the Board's record does not appear to contain an updated labor market survey for that position.

[7] UPS asserts that in the 1999 survey NRS found "approximately 770 people employed in various specialties of dispatching" in Alaska, but the NRS report did not indicate how many of these jobs corresponded to "motor vehicle dispatcher," Mitchell's occupational goal. NRS reported that fewer than half of the 770 dispatching positions were for "non-emergency services," suggesting that emergency dispatchers are not the same as motor vehicle dispatchers. And in contrast to 1997, NRS did not use the unique DOT codes for Mitchell's occupational goals in reporting the results of its online search in 1999.

February 2000.  Mitchell completed the externship, and in late July NRS closed his file.  In April 2000 Dr. Peterson rated Mitchell as having a 20% whole person impairment, an increase of 10%.  While UPS's medical evaluator initially disagreed, he later revised his opinion and agreed with Dr. Peterson's 20% rating.  Mitchell continued to complain of back pain, and in June Dr. Peterson referred Mitchell to Dr. Lawrence Stinson for pain management.  Mitchell had a third lumbar surgery in August 2001 after both Dr. Peterson and UPS's medical evaluator agreed that the bone graft used in the 1999 surgery had not fused to the vertebrae.  After the third surgery did not resolve Mitchell's pain, he began an odyssey of medical care in an attempt to relieve it.

C.      2003 Functional Capacities Evaluation

After Mitchell filed a written claim in 2002, UPS sent Mitchell to Dr. Douglas Smith for evaluation and asked Dr. Smith to address several issues, including Mitchell's "physical limitations" for employment purposes and his continued capacity to work at the occupational goals from his reemployment plan.  Dr. Smith referred Mitchell for a functional capacities evaluation with Alan Blizzard, a physical therapist.  Blizzard used a specific protocol for the evaluation and concluded that Mitchell was limited to sedentary work with accommodations.  Blizzard noted that Mitchell "performed with good overall consistency" and that Mitchell produced a "validity summary of 85%."  According to Blizzard "a validity summary of 75% or greater is seen as a valid test [using that protocol] and does suggest maximal effort."  Blizzard placed Mitchell "in a sedentary strength demand level" due to his "lifting evaluation" but also documented other restrictions:  the evaluation showed that Mitchell should only sit, stand, and walk infrequently; could not stoop at all; and was able to kneel and reach overhead occasionally.  Blizzard recommended that Mitchell use only level surfaces because of balance.  Because of Mitchell's limitations Blizzard said certain

"accommodations would be necessary" for Mitchell to return to the work force, including "a workstation that allows him to go from sit-to-stand as necessary."

Based on this evaluation, Dr. Smith informed UPS that Mitchell did not then have the physical capacities to work as an "Administrative Clerk" because that position had a "light" strength level, which exceeded Mitchell's documented strength level. Dr. Smith said the other two positions would be "within [Mitchell's] capabilities with the accommodations outlined in" Blizzard's report. Dr. Smith agreed Mitchell now had a 20% impairment and recommended that medical care be limited to pain medication. UPS controverted both medical care other than that recommended in Dr. Smith's report and further reemployment benefits. No additional evidence about the labor market for work that could accommodate the specific limitations identified in Blizzard's evaluation is contained in the record.

## D.    2006 Dynesys Surgery

Dr. Peterson recommended in 2003 that Mitchell's pain be managed with conservative care as long as possible because he thought Mitchell's fusion had already put increased stress on the adjacent vertebral level, L4-L5, and he was concerned the process could continue. Dr. Peterson nonetheless referred Mitchell to Dr. Rick Delamarter in California for an evaluation for disc replacement surgery in early 2005. UPS would not pay for this evaluation, prompting Mitchell to file another written claim.

Mitchell paid for travel to California and consulted with Dr. Delamarter's office in July 2005. After reviewing imaging, Dr. Delamarter concluded Mitchell was not a candidate for disc replacement surgery because of arthritic changes in his spine. Dr. Delamarter proposed instead that Mitchell undergo surgery to implant a Dynesys stabilization system, the surgery at issue on appeal. The Dynesys system was described as "designed to stabilize the spine without fusing." However, at that time the FDA allowed marketing the Dynesys system only "as an adjunct to fusion" (with some

conditions) or as a fixation system in circumstances not relevant here. The FDA required the device's manufacturer to warn doctors that the device had not been approved for stabilization without fusion, and clinical trials were pending to determine its effectiveness when used without fusion surgery. Dr. Delamarter was a participant in the clinical trials, but no one has contended that Mitchell's treatment was part of those trials. Dr. Delamarter did "not recommend a fusion" for Mitchell because he thought Mitchell's L4-L5 symptoms were related to his L5-S1 fusion. The parties disputed the FDA-approval status of the Dynesys system. UPS would not authorize the Dynesys surgery because it had controverted all medical care other than pain medication.

In September 2005 the Board heard Mitchell's claim for medical care. Both parties submitted written materials about the Dynesys system, and it was discussed briefly at the hearing. The resulting decision, *Mitchell VI*,[8] did not explicitly mention the Dynesys surgery, but it found that in 2003 "Dr. Peterson developed a conservative treatment plan to avoid surgery at L4-L5." The Board set out a process to resolve remaining disputes about past medical care and "retain[ed] jurisdiction to resolve . . . future disputes" about future medical treatment. Shortly afterwards, in *Mitchell VII*, the Board ordered UPS to pay for Mitchell's 2005 consultation with Dr. Delamarter and found that Dr. Peterson "recanted his opinion regarding a conservative care treatment plan" when he referred Mitchell to Dr. Delamarter for evaluation.

An attorney entered an appearance on Mitchell's behalf in January 2006 and filed a written claim for the Dynesys surgery. UPS answered and controverted, asserting that *Mitchell VI* barred the claim for the surgery because it had determined that Mitchell was entitled only to conservative care. Mitchell's attorney then filed a

---

[8]     The Board and Commission used Roman numerals to refer to the 16 Board decisions issued in this claim. We follow the agencies' convention, but we discuss only those decisions relevant to specific issues on appeal.

modification petition related to the Dynesys surgery. Mitchell's attorney withdrew when Mitchell declined to follow through on a mediated settlement. Mitchell, self-represented, filed another written claim in July seeking ongoing disability benefits and payment for medical care. UPS answered and controverted.

Mitchell decided to proceed with the Dynesys surgery without waiting for Board approval, borrowing a substantial amount of money to pay for it. Dr. Delamarter performed "L3 through L5 posterior decompression and stabilization with Dynesys" in August 2006. Mitchell initially reported significant improvement in his pain following the surgery. But about a year after the Dynesys surgery, Mitchell saw Dr. Stinson for back pain and appeared depressed. By December 2007 he was reporting increased back pain.

### E.  2008-2017:  Medical Care And Board Proceedings

In July 2008 Mitchell filed both an affidavit of readiness for hearing on his July 2006 written claim and another claim again seeking ongoing disability and medical costs. UPS opposed setting a hearing and specified information it needed to defend against the 2006 claim at a hearing, such as a more recent employer's medical evaluation (EME). It also answered and controverted the 2008 claim.

Dr. Stinson's chart notes from late 2008 show Mitchell had "increasing lumbago" and degenerative changes. Dr. Stinson continued to treat Mitchell for pain during the ensuing ten years, including implanting a spinal cord stimulator.

In March 2009 the Social Security Administration decided Mitchell was eligible for Social Security Disability effective April 1, 2004. In June 2010 Mitchell filed a workers' compensation claim for several benefits, including permanent total disability after April 1, 2004, citing the Social Security decision as the reason for filing the claim. Mitchell's healthcare providers also filed claims in 2010. UPS answered and controverted.

There is a sizeable and unexplained gap in the Board proceedings from September 2008 to August 2012 during which there is no record of any prehearing conference in Mitchell's case.[9] The Board's proceedings resumed in 2012 after Mitchell requested a prehearing conference "to clarify the status of his case" and petitioned for discovery from UPS. UPS then moved to dismiss some of Mitchell's written claims, arguing that they were res judicata and that Mitchell did not timely request a hearing on them. After a hearing the Board in *Mitchell IX* dismissed some claims as res judicata but decided that Mitchell had filed a timely hearing request for the 2006 claim and that the 2008 and 2010 claims amended the 2006 claim. The Board determined the petition for modification of *Mitchell VI* had never been decided and was still viable, meaning *Mitchell VI* was not a final decision on the Dynesys surgery and res judicata did not bar Mitchell's claim for that surgery.[10]

A different attorney began to represent Mitchell in 2014. Dr. Alan Brown, an orthopedist, did a records review for UPS at that time. Dr. Brown diagnosed Mitchell with failed back syndrome and "diskogenic low back pain." He thought the Dynesys surgery was "ill advised, but not below the standard of care." In response to UPS's question about employment and strength demand levels, Dr. Brown thought Mitchell was "limited to sedentary and/or light-level work" in 2015, adding that Mitchell was "only limited by his subjective perception of his pain."

Mitchell underwent an EME with Dr. Dennis Chong, a physiatrist, in May 2015. Dr. Chong considered the Dynesys surgery "absolutely not required for the

---

[9]     The record has a February 2010 notice of prehearing conference, but if one was held there is no summary of it in the record.

[10]     In July 2015, in *Mitchell XIII*, the Board denied the March 2006 petition to modify but left unresolved the question whether the surgery was reasonable and necessary.

process of recovery from the 1995 work injury," pointing out that Mitchell had no improvement following the procedure. Dr. Chong said that none of Mitchell's treatments were "outside of the realm of accepted medical practice," but added that "they were not reasonable or necessary in that they did not assist in [Mitchell's] recovery or rehabilitation."

Based on Mitchell's report of his daily activities, Dr. Chong said Mitchell was at that time "performing at least a sedentary physical demand capacity level." Dr. Chong said there was "no objective basis such as loss of a limb or paralysis" that would make Mitchell physically unable to work, essentially echoing Dr. Brown's opinion that "subjective pain complaints" were the only reason Mitchell could not work.

In December 2014 the Board ordered a second independent medical evaluation (SIME) with both an orthopedist and a physiatrist, selecting Dr. Thomas Gritzka as the orthopedic specialist, and (after some delay) Dr. James Robinson, who is also a psychologist, as the physiatrist. Dr. Gritzka saw Mitchell in July 2015; Dr. Robinson did not see him until January 2017.

As relevant to this appeal, Dr. Gritzka said the Dynesys surgery "was not unreasonable [or] unnecessary," calling it a "hopeful procedure which was intended to stabilize without eliminating all motion of the lumbar spine." With respect to a comment Dr. Delamarter made to the effect that the device had FDA approval, Dr. Gritzka said it was "not clear whether this was a provisional approval given to only certain investigators" but indicated that to the best of his knowledge "the Dynesys system had not been released for generalized use" when Mitchell had the surgery.

Dr. Gritzka thought Mitchell's physical capacities had likely not changed since Blizzard's 2003 functional capacities evaluation but "[t]o answer the question exactly would require a repeat performance based physical capacities evaluation." Dr.

Gritzka said Mitchell "was noted long ago to be capable of at least sedentary work," citing Blizzard's evaluation. No physical capacities evaluation was done after this report.

Dr. Robinson concluded Mitchell was permanently and totally disabled as of January 2017, when Dr. Robinson examined him. Dr. Robinson refused to speculate about Mitchell's disability in 2004 because Dr. Robinson had not been able to evaluate him before 2017. He did say, however, that "Mitchell's physical capacities at this time are more likely to be less than they were as of the summer of 2003," with the qualification that Mitchell's medical records reflected an increase in his "functional capacities . . . at least for a period of weeks or months following various procedures he underwent."

Dr. Robinson offered a different perspective on Mitchell's condition, criticizing some of Mitchell's medical care as well as the multiple litigation-related medical evaluations. Of the numerous invasive procedures Mitchell had undergone, Dr. Robinson thought only the spinal cord stimulator was justified, but he recommended that Mitchell be required to undergo a psychological evaluation before any surgery to modify the device. Dr. Robinson addressed Dr. Chong's and Dr. Brown's comments about Mitchell's pain and his disability. Regarding their opinions that Mitchell "could function in a work environment except for his perception of pain," Dr. Robinson wrote, "This type of assessment glosses over the fact that pain is the problem that disables individuals with back conditions. . . . [T]hey do not become disabled because of some kind of mechanical failure of their bodies; instead, they are unable to function because of the symptoms that they experience when they attempt to be active." After estimating the likelihood that Mitchell could "successfully reintegrate into the workforce" as "virtually

zero,"[11] and predicting Mitchell "will not return to competitive employment," Dr. Robinson distinguished two issues: whether Mitchell "*should be* able to work, and therefore should be denied benefits" (emphasis in original) or whether "his pain is so intrusive that it makes it impossible for him to sustain gainful employment." Dr. Robinson "favor[ed] [the] latter interpretation of his situation."

The Board scheduled a two-day hearing in 2017 on all of Mitchell's claims. Mitchell presented testimony from several witnesses, including Daniel LaBrosse, a vocational rehabilitation specialist who had participated as "an impartial vocational expert" at Mitchell's Social Security hearing. The Board had deposition testimony from Drs. Stinson and Chong as well as volumes of medical reports and records spanning more than 20 years.

A piece of evidence relevant to the issues on appeal is a letter written by LaBrosse that concluded Mitchell was permanently and totally disabled as of July 31, 2003 and was unable to work even at a sedentary level. At the Board hearing LaBrosse discussed some issues related to this letter. LaBrosse indicated that "sedentary labor usually requires six hours of sitting"[12] and that "without the capacity to sit for six hours, it's very hard to identify sedentary jobs that an individual could do on a full-time basis." At the hearing UPS offered no vocational evidence other than information from the reemployment process.

Other pieces of evidence relevant to this appeal are Blizzard's 2003 functional capacities evaluation and Dr. Chong's 2017 deposition about the evaluations.

---

[11] Dr. Brown voiced a similar opinion, writing that based on his "training, experience, and education," he thought "the odds of [Mitchell] going back to the workforce after this length of time is extremely low statistically."

[12] This standard has been used in Social Security cases. *See, e.g.*, *Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984).

Dr. Chong testified that in 2003 "this type of report was the standard of care." Dr. Chong thought Blizzard had been "exceptionally conservative" in his estimations of Mitchell's capacities but said he would "agree at a minimum" with Blizzard's conclusions. Dr. Chong identified some data that in his view showed that Mitchell had provided "submaximal" effort during Blizzard's exams — Blizzard's report included some of the facts Dr. Chong mentioned — but Dr. Chong did not contradict Blizzard's ultimate findings, and concluded that Mitchell was able as of 2003 to perform work that was sedentary.[13] Dr. Chong did not testify about the specific protocol Blizzard used to evaluate Mitchell and questioned neither the method used in that protocol to evaluate validity nor Blizzard's interpretation of the validity scale.

Mitchell himself testified at the hearing. He continued to report back pain and limits on his activities. He testified that he did not try to apply for work as a rate clerk because he did not think his reemployment plan had provided the necessary training. He said he could not work because of his ongoing pain. Mitchell expressed satisfaction with the medical care he had received over the years.

**F.    2018-2019:  Final Board Decision And Commission Appeal**

The Board issued a comprehensive decision with two partial dissents. We summarize only those parts of the decision related to this appeal.

The Board determined that Mitchell's 1995 work injury was a substantial factor in his need for medical care and considered the reasonableness and necessity of specific medical procedures. The Board, with one member dissenting, concluded the

---

[13]    UPS contends on appeal that Dr. Chong testified that "Mitchell was capable of sedentary to light duty work in 2003," but provides no record citation to support this assertion. We were unable to find testimony in Dr. Chong's deposition suggesting that Mitchell could in fact perform light duty work in 2003. Dr. Chong speculated in his 2015 report that Mitchell might be able to function in a light level job at that time, but he indicated he would need more information.

Dynesys surgery was "neither reasonable nor necessary" medical care for Mitchell's work injury.[14] In reaching this decision, the Board agreed with UPS that the "most relevant" evidence was that "showing what occurred" between the December 2005 *Mitchell VI* decision, where the Board decided conservative care was reasonable, and the August 2006 surgery. The Board summarized those medical records and decided that "nothing changed significantly"; it expressed concern that Dr. Delamarter's use of the Dynesys implant was "contrary to an FDA warning." In light of these factors and Mitchell's lack of long-term improvement following the surgery, the Board decided the surgery was not reasonable or necessary.

On the claim for permanent total disability, the Board applied its three-step presumption analysis.[15] At the first step, it decided Mitchell had attached the presumption that he was permanently and totally disabled as a result of his work with UPS.[16] The Board, considering the entire time period from 2004 to 2018, decided that UPS rebutted the presumption because (1) Blizzard said Mitchell "was capable of working at sedentary employment"; (2) "Drs. Brown, Chong[] and Gritzka all opined he could work at least at sedentary and possibly at light duty work based on his physical

---

[14]     *See* AS 23.30.095 (requiring employer to provide medical care for work-related injury); *Bockness v. Brown Jug, Inc.*, 980 P.2d 462, 466 (Alaska 1999) (construing Act as requiring provision only of reasonable and necessary medical care).

[15]     *See Meek v. Unocal Corp.*, 914 P.2d 1276, 1279-80 (Alaska 1996) (holding that presumption applies to permanent total disability claims); *see also Sokolowski v. Best W. Golden Lion Hotel*, 813 P.2d 286, 292 (Alaska 1991) (holding that employee is entitled to the presumption of compensability for each prong of a test related to compensability).

[16]     To attach the presumption, an employee must "offer 'some evidence' that the claim arose out of his or her employment." *Gillispie v. B & B Foodland*, 881 P.2d 1106, 1109 (Alaska 1994) (quoting *Robinett v. Enserch Alaska Constr.*, 804 P.2d 725, 728 (Alaska 1990)).

examinations"; and (3) NRS "said there were thousands of jobs within the Anchorage labor market for which [Mitchell's] retraining qualified him." The Board then considered whether Mitchell had carried his burden of proving that he was permanently and totally disabled and decided he had not "convincingly proven" that he was permanently and totally disabled from April 1, 2004 through January 2017, when Dr. Robinson evaluated him. It found, however, that Mitchell had proved he was disabled as of the date of Dr. Robinson's evaluation.

Mitchell appealed to the Commission, contending the Board erred in denying disability benefits before 2017 and in finding the Dynesys surgery not reasonable and necessary.[17] The Commission affirmed the Board's decision. The Commission first considered the disability claim. The Commission decided that UPS rebutted the presumption that Mitchell was disabled with Blizzard's opinion that Mitchell could do some sedentary work, and it noted that both Dr. Gritzka and Dr. Chong concurred in Blizzard's opinion about Mitchell's functional capacities in 2003. The Commission rejected Mitchell's argument that the 1997 and 1999 labor market surveys were "unduly stale in 2003, when Mr. Mitchell was deemed . . . capable of sedentary work," noting that this argument went "to the weight of the evidence, not its existence." It likewise rejected Mitchell's argument "that there was no 'competent' [reemployment] plan," and it stated there was evidence in the record to support a finding that he completed the plan. Based on Blizzard's conclusion that Mitchell could do sedentary work with accommodations, as well as the labor market surveys and Mitchell's training, the Commission decided there was enough evidence to rebut the presumption.

The Commission disagreed somewhat with the Board's discussion of the Dynesys surgery and the evidence the Board considered relevant. The Commission was

---

[17] UPS filed a cross-appeal on one issue but did not appeal that issue to us.

concerned the Board did not give adequate weight to Mitchell's doctors' opinions. But the Commission determined that its "concerns" did "not affect [its] conclusion that the Board did not err in denying payment for the Dynesys surgery."

Mitchell appeals.

## III.   STANDARD OF REVIEW

In an appeal from the Commission, we review the Commission's decision and not the Board's.[18] "We review de novo the Commission's legal conclusion that substantial evidence supports the Board's factual findings by 'independently reviewing the record and the Board's findings.' "[19] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[20] "Whether the quantum of evidence is substantial is a question of law."[21]

"When we review the Commission's legal conclusions about the Board's exercise of discretion . . . , we . . . independently assess the Board's rulings and in so doing apply the appropriate standard of review."[22] "We will find an abuse of discretion when the decision on review is 'arbitrary, capricious, or manifestly unreasonable.' "[23]

## IV.   DISCUSSION

---

[18]     *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1121 (Alaska 2017).

[19]     *Vue v. Walmart Assocs., Inc.*, 475 P.3d 270, 279 (Alaska 2020) (quoting *Humphrey v. Lowe's Home Improvement Warehouse, Inc.*, 337 P.3d 1174, 1178 (Alaska 2014)).

[20]     *Id.* (quoting *Humphrey*, 337 P.3d at 1179).

[21]     *Id.* (quoting *Humphrey*, 337 P.3d at 1179).

[22]     *Smith v. CSK Auto, Inc.*, 204 P.3d 1001, 1007 (Alaska 2009).

[23]     *Alaska State Comm'n for Hum. Rts. v. United Physical Therapy*, 484 P.3d 599, 605 (Alaska 2021) (quoting *Tufco, Inc. v. Pac. Env't Corp.*, 113 P.3d 668, 671 (Alaska 2005)).

**A.** **The Commission Erred By Concluding That UPS Provided Sufficient Evidence To Rebut The Presumption That Mitchell Was Permanently And Totally Disabled In 2004.**

To decide whether an injured worker is entitled to compensation for disability, two questions must be answered. First, what are the worker's limitations resulting from the injury? Second, are there jobs available that the worker can do despite those limitations? Because UPS's evidence fails to show the availability of jobs that would accommodate Mitchell's limitations in 2004, we conclude that UPS did not rebut the presumption that Mitchell was disabled on that date.

For purposes of the Alaska Workers' Compensation Act, "disability" means "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment."[24] According to the Act, "[l]oss of both hands, or both arms, or both feet, or both legs, or both eyes, or of any two of them, in the absence of conclusive proof to the contrary, constitutes permanent total disability."[25] "In all other cases permanent total disability is determined in accordance with the facts."[26]

UPS does not dispute that Mitchell attached the presumption that he was permanently and totally disabled as of April 2004, so the key question for this appeal is whether UPS rebutted that presumption. In permanent total disability cases, we have held that "[t]o rebut the presumption of compensability, 'an employer must show that there is regular and continuously available work in the area suited to the employee's

---

[24] AS 23.30.395(16). The definition of disability has not changed since 1959. *See* ch. 193, § 2(7), SLA 1959.

[25] AS 23.30.180(a).

[26] *Id.*

capabilities, i.e., that [the employee] is not an odd lot worker.' "[27] The evidence must be "comprehensive and reliable, and account for relevant factors defining disability."[28] A disability determination requires consideration of multiple factors, including the employee's physical abilities, age, education, and the work available in the area suited to the employee's capabilities.[29] To rebut the presumption that an employee is disabled as of a certain date, an employer's evidence must demonstrate not only that the employee has the physical capacities to do some work at the onset of the disability period but also that regular and continuously available work then exists in the relevant labor market that is within the employee's specific physical capacities and training.[30]

Mitchell contends that UPS failed to provide sufficient evidence to rebut the presumption because it did not show the existence of "sedentary jobs within his skill set" or "demonstrably amenable to accommodation of his unique restrictions." UPS defends the Board's and Commission's decisions, citing two categories of evidence: (1)

---

[27]     *Leigh v. Seekins Ford*, 136 P.3d 214, 216 (Alaska 2006) (quoting *Carlson v. Doyon Universal-Ogden Servs.*, 995 P.2d 224, 229 (Alaska 2000)).

[28]     *Carlson*, 995 P.2d at 228-29.

[29]     *Vetter v. Alaska Workmen's Comp. Bd.*, 524 P.2d 264, 266 (Alaska 1974).

[30]     *See Leigh*, 136 P.3d at 221 ("[T]he proper focus must remain on whether the employer has presented substantial evidence that there are jobs reasonably available in the relevant labor market that the employee could realistically obtain and hold."). Because the Act defines "disability" as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment," AS 23.30.395(16), the wage level of available employment may be a relevant factor as well. But AS 23.30.180(b) expressly provides that "remunerative employability as defined in AS 23.30.041(r)," which establishes the target wage for an injured worker's reemployment program at 60% of gross hourly wages at the time of injury, "does not, by itself, constitute permanent total disability." Given the outcome of this appeal, we do not address this issue.

the medical evidence of Mitchell's limitations, established by Blizzard's evaluation, the 2015 EME reports, Dr. Gritzka's report, and Dr. Chong's deposition testimony; and (2) the vocational evidence of jobs available to Mitchell, based on the labor market surveys prepared for Mitchell's reemployment plan and his completion of that plan.[31] UPS argues nothing indicates that the plan "was not valid," implying that Mitchell was able to perform the occupational goals identified in the plan.[32] UPS contends that the labor market surveys provided sufficient evidence about the availability of suitable jobs because (1) the surveys were "just as old" as the medical evidence Mitchell relied on to attach the presumption and (2) they showed that there was a labor market for Mitchell's reemployment goals.

The Board and Commission relied on this medical and vocational evidence to different degrees when determining that UPS rebutted the presumption. The Commission appropriately used medical evidence directly relevant only to Mitchell's

---

[31] In its appellate argument about rebutting the presumption, UPS mentions a finding about the availability of certain jobs the Board made on the basis of its "experience, judgment, and observations." Mitchell takes exception to the finding. The Board did not use this finding in its rebuttal analysis, relying on the finding only at the third stage of the presumption analysis, when the Board considers all of the evidence and weighs it. Because the rebuttal stage shifts the burden of producing evidence to the employer, *Vue v. Walmart Assocs., Inc.*, 475 P.3d 270, 284 (Alaska 2020), the Board properly considered only evidence UPS presented when deciding whether UPS rebutted the presumption. To the extent the Commission's rebuttal discussion might be read as including this Board finding, it was error because only evidence the employer produces can be considered at the rebuttal stage. *Id.*

[32] The appellate briefing reflects continuing disagreement about the reemployment plan, including its efficacy, its components, and Mitchell's completion of the plan. We agree with the Commission that "any objection . . . to the content of the plan should have been raised at the time the plan was developed."

2004 physical capabilities in its discussion of the rebuttal evidence.[33] The Commission determined that UPS presented substantial medical evidence that Mitchell had the physical capacity to perform work through Blizzard's evaluation, which was endorsed by Drs. Gritzka and Chong.[34] While citing Blizzard's conclusion that Mitchell should

---

[33] The Board relied on other opinions at the rebuttal stage, but it cited Dr. Robinson's opinion that Mitchell was permanently and totally disabled in January 2017 as medical evidence that attached the presumption. The Board found that Mitchell had carried his burden of proving he was permanently and totally disabled as of January 2017; UPS did not ask the Commission to reverse that part of the Board decision, so the Commission correctly concluded it needed to look only at evidence relevant to Mitchell's condition in 2004.

Mitchell raised a question in his appellate briefing about the specific dates the administrative agencies used to mark the time periods of his disability and the existence of corresponding rebuttal evidence. For example, the Board cited a medical opinion from 2007 and the Commission cited one from 2006 as attaching the presumption, yet neither agency discussed rebuttal evidence from those years. We recognize this is a problem that stems in part from the long duration of this case, but we need not resolve this issue given the nature of our ruling on Mitchell's claim.

[34] UPS cites Dr. Brown's and Dr. Chong's 2015 reports as additional evidence to rebut the presumption that Mitchell was disabled in 2004, but we agree with the Commission's conclusion that the 2015 material UPS relied on does not address Mitchell's physical capacities in 2004. Because we agree with that conclusion, we do not discuss the 2015 reports.

Mitchell tried to raise an argument that the Board needed to consider whether his chronic pain and use of narcotics to manage it affected his ability to work. This argument emphasizes the similarity between his own doctors' opinions throughout the years and Dr. Robinson's opinion (which the Board relied on to find Mitchell permanently and totally disabled after January 2017) that the 1995 work injury "set in motion a series of events" that caused his disabling pain, which was "so intrusive that it makes it impossible" to work. We reversed the Board's decision in *Leigh* in part because the Board failed to make adequate findings about disabling pain when it weighed the evidence; we did not discuss whether or how evidence about pain and resulting narcotic use needed to be addressed at the rebuttal stage. 136 P.3d at 219. Because we conclude

(continued...)

be classified at the "sedentary strength demand level," neither the Commission nor the Board mentioned other limitations Blizzard identified, such as limitations on his ability to sit, or the accommodations that Blizzard said "would be necessary for [Mitchell] to perform on a daily basis."

The problem with the vocational evidence relied on is that it is not tailored to the specific limitations Blizzard identified. The only vocational evidence UPS presented about the existence of work suited to Mitchell's capabilities in 2004 (or at any time) were the labor market surveys that NRS performed in 1997 and 1999 while Mitchell was in the reemployment process. The Board and Commission both relied on this information to conclude the employer rebutted the presumption, even though it was undisputed that Mitchell's physical condition had changed in the intervening five years. Mitchell had two lumbar surgeries between the 1999 labor market survey and April 1, 2004, the date he alleged he became permanently and totally disabled; those surgeries increased his permanent impairment rating from 10% to 20%. Moreover, when Blizzard and Dr. Smith evaluated Mitchell for UPS in 2003, they concluded that Mitchell no longer had the physical capacity to perform light work, disqualifying him from the "thousands" of "administrative clerk" positions.

To determine whether UPS rebutted the presumption, it was necessary to first identify Mitchell's limitations as shown by UPS's evidence. Then, with those limitations in mind, it was necessary to determine whether UPS's vocational evidence showed the existence in the relevant labor market of regular and continuously available work matching those limitations. Blizzard qualified the conclusion that Mitchell could work "at a strength demand level of sedentary" with several "necessary"

---

[34]      (...continued)
that UPS did not provide adequate vocational evidence to rebut the presumption, we do not address this issue.

accommodations, including the ability "to go from sit-to-stand as necessary," "very infrequent bouts of walking," working on level surfaces, and no stooping. Blizzard's evaluation showed limitations in reaching as well. Dr. Chong described Blizzard's evaluation as "exceptionally conservative" in evaluating Mitchell's lifting capacity, but he did not mention the other limits Blizzard said would be necessary for Mitchell to perform work on a daily basis. Nothing in Dr. Chong's deposition testimony indicated that Mitchell had the physical capacity to sit for hours at a time in 2004. And ultimately Dr. Chong indicated his agreement with Blizzard's evaluation. UPS's medical evidence thus showed that Mitchell had some physical capacity to work, but it was limited to sedentary work with specific accommodations for numerous limitations. One of the most important limitations was related to sitting.

Sitting is, obviously, an inherent feature of sedentary jobs. The vocational evidence UPS presented was based on job descriptions and classifications in the SCO and the DOT.[35] The SCO classifies work at different strength levels depending on "three elements in the physical demands of a job," including body position and weight/force; it "condense[s] these three elements into a single rating reported as the overall Strength Level of the occupation."[36] In the SCO "sedentary work" is defined as

> exerting up to 10 pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body. *Sedentary work involves sitting most of the time*, but may involve walking or standing for brief periods of time. Jobs

---

[35] The DOT contains job descriptions for occupations, including information about the necessary training and physical demands for them, and gives each listed occupation a unique code. The SCO contains a summary of the physical demands and vocational requirements of jobs in the DOT. *See supra* note 4. AS 23.30.041 requires use of the SCO in reemployment eligibility evaluations.

[36] SCO, *supra* note 4, at C-1.

> may be defined as Sedentary when walking and standing are required only occasionally and all other Sedentary criteria are met.[37]

The related edition of the DOT refines this definition by specifying that "occasionally" means that the "activity or condition exists up to 1/3 of the time" and that "frequently" means that the "activity or condition exists from 1/3 to 2/3 of the time."[38] Nothing in the record suggests that NRS used a definition of "sedentary work" that differed from the definition in the SCO and the DOT when it prepared the labor market surveys.

There is no indication that the 1997 or 1999 labor market surveys considered limitations on Mitchell's ability to sit for any length of time, possibly because no sitting limitations were quantified in Mitchell's medical records before the 1999 labor market survey. The 1997 "motor vehicle dispatcher, traffic rate clerk" labor market survey had no information specific to any physical demands from any employer contacted by NRS. The 1997 "administrative clerk" survey showed that only two employers specifically told NRS they offered "reasonable accommodations." "Administrative clerk" is classified as "light," and there was no medical evidence that in 2004 Mitchell could in fact perform "light" work with or without accommodations.[39]

---

[37]     *Id.* at C-2 (emphasis added).

[38]     2 DOT, *supra* note 4, at 1013.

[39]     The Board interpreted Dr. Chong's, Dr. Brown's, and Dr. Gritzka's opinions as saying Mitchell was "possibly" able to do light work "based on his physical examinations." (Dr. Brown did not examine Mitchell.) The Board did not explain the relevance of this remark, and those opinions appear to be speculation about what Mitchell *might* be able to do in 2015 rather than substantial evidence about what he could in fact do in 2004. As we have stated, "An expert's speculation is not substantial evidence . . . ." *Vue v. Walmart Assocs., Inc.*, 475 P.3d 270, 291 (Alaska 2020). Regardless, the definition of "light" work that UPS provided its medical examiners and

(continued...)

Both the "administrative clerk" survey and the 1999 survey contained information about certain jobs that explicitly mentioned sitting as a job requirement; for example, one rate clerk/dispatcher position required "the ability to sit for eight hours" and an administrative clerk position required "significant sitting."

In defending the Commission's decision, UPS focuses on the fact that the surveys were "just as old" as the evidence Mitchell relied on to establish the presumption of disability. But the vintage of the evidence is not the determinative factor when considering whether the evidence rebutted the presumption. The question is whether this evidence, considered "in isolation, without weighing it,"[40] was substantial evidence that regular and continuously available work existed in the relevant labor markets that was within the physical limitations documented in the medical evidence UPS presented about Mitchell's physical capacity in 2004. The labor market surveys had no information about the regular and continuous availability of work that could accommodate all of the limitations listed in Blizzard's evaluation. The surveys were therefore "stale" not simply because NRS prepared them in 1997 and 1999 but because the information in them did not account for the changes in Mitchell's physical capacities between early 1999 and April 1, 2004, the date Mitchell alleged he became permanently and totally disabled. Blizzard identified specific limitations and necessary accommodations. The surveys do not show a labor market for positions that could accommodate these restrictions.

---

**39** (...continued)
the SIME doctor was an incomplete version of the definition in the relevant references because it was limited to the amount of weight an individual could lift. *See supra* notes 35-38 and accompanying text.

**40** *McGahuey v. Whitestone Logging, Inc.*, 262 P.3d 613, 620 (Alaska 2011) (citing *Stephens v. ITT/Felec Servs.*, 915 P.2d 620, 624 (Alaska 1996)).

We do not hold that the Board must consider every aspect of an SCO job description in every permanent total disability case. But when the employer's own medical evidence shows, as it did here, that an employee has specific limits on his physical capacities, the vocational evidence must correspond to those limitations. Otherwise, the evidence does not "account for relevant factors defining disability" and cannot be considered substantial.[41] The Board's conclusion at the rebuttal stage did not take into account all restrictions in Blizzard's evaluation, even though the Board explicitly relied on its conclusions as rebuttal evidence. Both Blizzard and Dr. Smith qualified their opinions that Mitchell could do sedentary work by saying that certain accommodations related to Mitchell's other limitations would be necessary. UPS did not present any vocational evidence about the availability of such work in the relevant labor markets.

For that reason we disagree with the Commission's evaluation of the vocational evidence. Blizzard's evaluation did not foreclose the possibility that some sedentary work might be available that Mitchell could perform, but UPS was required to present substantial evidence that such work in fact existed regularly and continuously in the relevant labor markets in 2004. At the rebuttal stage "the proper focus must remain on whether the employer has presented substantial evidence that there are jobs reasonably available in the relevant labor market that the employee could realistically obtain and hold."[42] That fact is not established by the sheer number of jobs documented in the labor market survey, which the Board and UPS emphasized. Most of the jobs documented were the "light" duty administrative clerk positions; the surveys showed far

---

[41] *Carlson v. Doyon Universal-Ogden Servs.*, 995 P.2d 224, 228-29 (Alaska 2000).

[42] *Leigh v. Seekins Ford*, 136 P.3d 214, 221 (Alaska 2006) (citing *Bunge Corp. v. Carlisle*, 227 F.3d 934, 941 (7th Cir. 2000)).

fewer "sedentary" positions than the "thousands" of jobs the Board mentioned. While NRS concluded there was a labor market for the sedentary positions in 1997 and 1999, the number of dispatcher and traffic rate clerk positions was not large. Indeed NRS told UPS in 1997 that the labor market for these positions and the trucking industry as a whole was "sluggish." And again, the labor market surveys did not establish that these jobs could accommodate Mitchell's documented limitations.

Because the labor market surveys from 1997 and 1999 did not address the changes in Mitchell's physical condition or his particular limitations, they did not provide substantial evidence that was comprehensive and "account[ed] for relevant factors defining disability."[43] The Commission erred by concluding otherwise, and we reverse that part of its decision.[44]

**B. The Commission Did Not Err In Concluding That The Board Did Not Abuse Its Discretion By Denying Reimbursement For The Dynesys Surgery.**

Mitchell also appeals the denial of reimbursement for the 2006 Dynesys surgery. Mitchell contends that the surgery was both reasonable and necessary in 2006 because of the severity of his symptoms and his concern about the impact of delaying the surgery. But we conclude that the Commission did not err in ruling that the Board properly exercised its discretion in denying reimbursement. The Board reasonably relied on the fact that the FDA had warned against the precise use of the Dynesys device Mitchell's surgery entailed and on evidence that the surgery did not ultimately improve his condition.

---

[43] *Carlson*, 995 P.2d at 228-29.

[44] Because UPS did not rebut the presumption, we need not consider whether Mitchell proved his claim by a preponderance of the evidence. *DeYonge v. NANA/Marriott*, 1 P.3d 90, 98 (Alaska 2000).

Under the Act employers are required to provide medical care for work-related injuries.[45] Within two years of the injury date, employers are required to pay for all medical care that is reasonable and necessary.[46] When the treatment occurs more than two years after the injury, the Board "is not limited to reviewing the reasonableness and necessity of the particular treatment sought, but has some latitude to choose among reasonable alternatives."[47] Mitchell suggests that we should reweigh the evidence, citing a pattern jury instruction given in civil cases. But that is not our role in a workers' compensation appeal. We review the Commission's conclusion that the Board did not abuse its discretion by independently assessing the Board's decision and applying the appropriate standard of review, which for this issue is whether the Board's decision denying reimbursement for the Dynesys surgery was "arbitrary, capricious, or manifestly unreasonable."[48]

Dr. Delamarter proposed the Dynesys surgery more than nine years after the reported injury. The surgery was discussed to a limited extent at the 2005 hearing that resulted in *Mitchell VI*, even if the Board did not make a specific finding about it in that decision. Mitchell was aware in 2006 that UPS contested the surgery, yet he chose to go through with the surgery without first getting Board approval. The Board ultimately denied Mitchell's petition to modify *Mitchell VI* and in *Mitchell XIII* left open

---

[45]     AS 23.30.095(a); *see also Phillip Weidner & Assocs., Inc. v. Hibdon*, 989 P.2d 727, 731 (Alaska 1999) (construing AS 23.30.095(a)).

[46]     *Hibdon*, 989 P.2d at 731; *Bockness v. Brown Jug, Inc.*, 980 P.2d 462, 466-67 (Alaska 1999).

[47]     *Hibdon*, 989 P.2d at 731.

[48]     *See Tufco, Inc. v. Pac. Env't Corp.*, 113 P.3d 668, 671 (Alaska 2005) (setting out abuse of discretion standard).

the question whether the surgery was compensable. The compensability of the surgery was one of many medical disputes the Board resolved in the decision on appeal to us.

The Commission and Board approached the evidence differently. The Board decided that the medical evidence "showing what occurred" between *Mitchell VI* in 2005 and the surgery in August 2006 was the "most relevant." The Commission thought the Board should have "approached the issue . . . anew," using all the evidence it had acquired in the years following *Mitchell VI*, including the opinions of the EME and SIME doctors.

We do not share the Commission's concern with the Board's evaluation of the evidence because we conclude that the Board considered much of the evidence the Commission mentioned in its discussion, as shown by the extensive findings of fact the Board made related to the surgery. While the Board may have concentrated on the evidence in the narrow window of time it identified, it considered additional evidence. The Board looked at medical records from Mitchell's earlier treatment when it discussed his medical condition before the surgery, and the Board relied on Mitchell's ultimate lack of improvement following the surgery to deny reimbursement. Even if the surgery was a "hopeful procedure which was intended to stabilize without eliminating all motion of the lumbar spine," as Dr. Gritzka thought, the Board could consider the surgery's actual outcome — its failure in the long term to provide pain relief or to increase Mitchell's functional abilities — when it denied reimbursement.

Mitchell argues that the Board erred by considering whether the FDA had approved the Dynesys device for the procedure he underwent, asserting that the Board used FDA approval as a "litmus test for reasonableness." This assertion misstates the Board's actions. While the Board evaluated the evidence about FDA approval — a necessary task because FDA approval was a hotly contested issue about which the parties submitted extensive evidence — the Board's concern was that as of the date of Mitchell's

surgery, "the FDA required a warning label on Dynesys packaging stating the exact use for which Dr. Delamarter put this device on [Mitchell's] spine was not established as safe or effective." This suggests the Board was concerned not just that the use was off-label but that Dr. Delamarter used the device in a way that was the subject of an FDA warning. Even though Dr. Delamarter wrote that "the Dynesys stabilization and decompression . . . is not experimental," the Board could reject his opinion and credit the wealth of information UPS provided to the contrary. In any event, this was just one of many factors the Board balanced in deciding the surgery was not compensable.

The Board's finding that the Dynesys surgery did not provide "long-term benefit" is supported by substantial evidence in the record. Mitchell reported some short-lived improvement in symptoms immediately following the surgery, but within two years he was again reporting debilitating pain. Even Dr. Stinson, who had treated Mitchell continuously for more than a decade with numerous interventions, acknowledged the surgery had not benefitted Mitchell in the long term. Moreover, when Dr. Stinson was told the details of the uses for which the FDA had approved the Dynesys system, he commented, "If that was the FDA approval, then [it] was probably not that difficult to predict it wasn't going to be that effective."

Because the Dynesys surgery took place more than two years after the reported injury, the Board had "some latitude" to choose between different medical care.[49] There was nothing arbitrary, capricious, or manifestly unreasonable about the Board's decision. The Board considered the evidence, made appropriate findings, and applied the correct statutory standard. Mitchell argues that he reasonably relied on Dr. Delamarter's recommendation in deciding to pursue the surgery, but Mitchell also knew at the time he borrowed the money to pay for it that the decision whether the surgery was

---

[49]    *Hibdon*, 989 P.2d at 731.

compensable was not his alone to make. As the Commission observed, the Board's comments showed that the Board considered the opinions of Mitchell's doctors but chose the reasonable alternative treatment of conservative care when it exercised its discretion to deny compensation for the Dynesys surgery. The Commission therefore correctly concluded that the Board did not abuse its discretion in denying the compensability of the surgery.

V.    **CONCLUSION**

We AFFIRM the Commission's decision that the Board did not abuse its discretion when it denied reimbursement for the Dynesys surgery. We REVERSE the Commission's conclusion that UPS rebutted the presumption that Mitchell was permanently and totally disabled as of April 1, 2004 and REMAND the case to the Commission with instructions to remand the case to the Board for an award of permanent total disability benefits to Mitchell.