*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| SAMUEL AMOS,<br><br>               Appellant,<br><br>v.<br><br>DAVID E. TIDWELL and STATE OF ALASKA, WORKERS' COMPENSATION BENEFITS GUARANTY FUND,<br><br>               Appellees. | Supreme Court No. S-18626<br><br>Alaska Workers' Compensation Appeals Commission No. 21-014<br><br>O P I N I O N<br><br>No. 7709 – July 26, 2024 |

Appeal from the Alaska Workers' Compensation Appeals Commission.

Appearances: Keenan Powell, Anchorage, for Appellant. David E. Tidwell, pro se, Bedford, Indiana. Noah I. Star, Assistant Attorney General, Anchorage, and Treg Taylor, Attorney General, Juneau, for Appellee State of Alaska, Workers' Compensation Benefits Guaranty Fund.

Before: Carney, Borghesan, and Henderson, Justices. [Maassen, Chief Justice, and Pate, Justice, not participating.]

CARNEY, Justice.

## I. INTRODUCTION

Samuel Amos fell from the roof of a shop building that he was helping David Tidwell build on property in North Pole owned by Travis and Tabitha Plambeck. Tidwell had promised to pay Amos for his work. Amos filed a workers' compensation

claim against Tidwell and the Alaska Workers' Compensation Benefits Guaranty Fund[1] for his injuries. Tidwell asked the Alaska Workers' Compensation Board to dismiss Amos's claim against him, alleging he had not hired Amos. The Board decided that Amos had an employment contract with Tidwell, but it determined Tidwell was not an "employer" under the Alaska Workers' Compensation Act. Citing our precedents distinguishing consumptive and productive uses of labor, the Board decided as a matter of policy that employment based on friendship falls within the consumptive uses exempt from the Act's coverage. The Alaska Workers' Compensation Appeals Commission affirmed the Board's decision based on similar reasoning that described Amos's work as falling within a history or custom of friends helping each other. Amos appeals, arguing that the Commission and the Board incorrectly construed the law. We agree and reverse the Commission's decision.

## II.    FACTS AND PROCEEDINGS

The legal issues in this case are related to our precedents interpreting the phrase "in connection with a business or industry" in the definition of "employer."[2] In *Kroll v. Reeser*, we interpreted that phrase to include a productive/consumptive distinction from Larson's treatise on workers' compensation.[3] In *Kang v. Mullins*, we applied the productive/consumptive distinction to a case involving what started as an oral agreement between friends, the same situation as this case.[4] And as in *Kang*,[5] the

---

[1]    The Fund pays workers' compensation benefits for compensable injuries when the injured employee's employer does not pay workers' compensation benefits either through an insurer or directly. *See* AS 23.30.082.

[2]    AS 23.30.395(20) (defining "employer" in pertinent part as "a person employing one or more persons in connection with a business or industry").

[3]    655 P.2d 753, 757 (Alaska 1982) (citing 1C ARTHUR LARSON, THE LAW OF WORKMEN'S COMPENSATION § 50.21, at 9-70 to 9-71 (1980)).

[4]    420 P.3d 1210, 1216-18 & n.33 (Alaska 2018).

[5]    *Id.* at 1216.

parties here had ambiguous and disputed roles that the Board needed to identify in order to clarify the legal relationships between them. Because of this ambiguity and the varied allegations in the administrative record about the parties' roles, we begin with a detailed summary of relevant facts.

## A. Facts

### 1. The parties and their relationships

Samuel Amos, David Tidwell and Travis Plambeck all lived in the Fairbanks-North Pole area for years.[6] Amos was acquainted with Tidwell; at one time they were friends but that relationship apparently changed after Amos's injury and workers' compensation claim. Travis and his wife Tabitha own and operate a flooring company, Plambeck Floor Customs, Inc.[7] Tabitha, the majority owner, is responsible for administrative duties like payroll; Travis works as the company's "commercial general manager." Tidwell worked at Plambeck Floor Customs for about nine months.

While it was undisputed that Tidwell and Amos were at one time friends, the length of time they were acquainted was disputed. Tidwell and Travis were also acquainted before Tidwell began to work for Plambeck Floor Customs in June 2019; they gave conflicting testimony about the length of this acquaintance. It was undisputed that Amos and Travis had not met prior to the shop construction.

Tidwell worked for Plambeck Floor Customs from June 2019 until mid-March 2020. Among the disputes before the Board was whether Tidwell was an employee of or contractor for Plambeck Floor Customs both during the construction project where Amos was injured and more generally throughout the time he worked for the company. The company's work orders listed him as a subcontractor, but his paystubs suggested he was an employee: he was paid hourly, including some overtime, and the company withheld taxes from his wages. The Plambecks and Tidwell agreed

---

[6]     Tidwell's current address is in Indiana.

[7]     We refer to the Plambecks by their first names when necessary for clarity.

he was an employee paid "piecemeal" or as a "pieceworker" for his work.[8] Tidwell testified at his deposition that he was free to bring others to work with him on Plambeck Floor Customs jobs. Travis disputed this, and Tidwell later denied ever saying he was authorized to hire others to help him on the company's jobs. The Plambecks and Tidwell agreed that Tidwell set his own hours.

At his deposition Tidwell identified his occupation as "carpenter." Before Tidwell worked for Plambeck Floor Customs, he and his wife operated a contracting business. Tidwell said he stopped operating the business in "2016 ish," but that afterward he continued to do "side jobs" when people called him. He testified he was generally paid cash when he did side jobs, "unless it was for a contractor [he knew]." When asked whether he reported as wages or income the money he got from the shop construction project where Amos was injured, he testified that he "deployed that to my pocket." According to Tidwell, building the shop for the Plambecks was his last side job in Alaska. Travis was aware that Tidwell did "a lot of side jobs and stuff" even when he was working for Plambeck Floor Customs.

Amos and Tidwell offered somewhat different accounts of the time they worked together, not just on the shop construction but more generally. Tidwell claimed Amos could never hold a job and that he provided Amos with work as a favor, but the extent of his assistance was unclear. Amos described working at many short-term jobs in the years before the injury, many apparently independent of Tidwell. Tidwell and Amos agreed that at one job Tidwell was not Amos's employer but his foreman. They

---

[8] At the hearing Tabitha explained that she used an hourly rate for Tidwell's pay because of the business software she used, and she testified that the State Department of Labor and Workforce Development had endorsed the company's payment arrangement with Tidwell. After this litigation began Tidwell filed a wage and hour claim against Plambeck Floor Customs, alleging the company owed him overtime for work he had done. The Wage and Hour Division closed the case, telling Tidwell that its investigation showed that he was not owed overtime.

also agreed that before the shop construction, Amos worked for Tidwell at one Plambeck Floor Customs job and that Tidwell paid Amos cash for that work. Amos testified that Tidwell interfered with Amos getting work with another man because Tidwell considered Amos his own employee. The Board did not use Tidwell's history of side jobs in its findings about Tidwell's status as an employer.

### 2. The agreement and the accident

Travis and Tabitha own a home. Travis wanted to build a shop on the property, and he initially contracted with someone who had his own framing business to "dry-in" the shop. The framing contractor and Travis agreed to a contract price of "around $6,000" for this work. The contractor subsequently got a bigger job elsewhere and did not do the work for Travis.

Travis, aware that Tidwell had construction experience and that Tidwell did side jobs, asked Tidwell if he would build the shop. According to Tidwell, he initially told Travis that he wanted $10,000 to $12,000 cash as a "friend price" for the job, but he later agreed to $6,000. Travis said in an affidavit that he "hired David Tidwell to construct an outbuilding" on his property; Tabitha echoed this assertion. Travis testified that he knew Tidwell would need help on the construction. There is no indication Travis hired anyone else for the shop project,[9] and he left to Tidwell the decision whether to pay others for the work they did on the shop. Tidwell assumed the task of finding others to work on the shop construction. Neither Tabitha nor Travis was aware that Tidwell had hired Amos until Amos was injured.

Amos and Tidwell both testified that Tidwell offered Amos work on the shop and agreed to pay Amos for that work. Tidwell also got assistance on the shop construction from Glenn Bressette. Bressette testified he met Tidwell about two weeks

---

[9] Both Tidwell and Amos testified that a company employee briefly worked in some capacity at the shop construction site; according to Tidwell, this was at Travis's direction.

before the shop construction but said Tidwell had been "like a brother to [him]" since Bressette arrived in Alaska. According to Bressette he wanted to get training in construction and agreed to work on the shop for no pay.

Shop construction began in mid-October 2019. On October 21, Amos fell about 18 feet from the partially constructed roof, fracturing both wrists and an elbow. He had substantial medical bills. He sought compensation for the injuries from the Plambecks, who talked to an attorney and notified their homeowners insurance.

Tidwell did not complete the shop construction after Amos's injury, and Travis hired someone else to do so. Travis paid Tidwell $3,000 in cash in November for work on the shop's construction. Following the accident, Tidwell did not pay Amos any cash for his work. Tidwell continued to work for Plambeck Floor Customs for several months after the accident but left that employment in March 2020.

### B.    Proceedings

Amos filed a written workers' compensation claim in November 2019, naming Tidwell and Travis as his employers and including a claim against the Fund because the "[e]mployer claims he is uninsured." On December 10, an attorney entered an appearance for Tidwell and Travis. The attorney amended his entry of appearance within a week to reflect that he represented only Plambeck Floor Customs and its workers' compensation carrier; that day he filed an answer on behalf of Plambeck Floor Customs, raising several affirmative defenses.[10] Tidwell never filed an answer on his own behalf. The company's attorney filed a controversion asserting, among other things, that there was "no employment relationship between David Tidwell and Mr. Amos." The Fund's answer denied that it was required to pay benefits to Amos but did not identify which of the eligibility criteria listed in its answer barred payment.

---

[10]    It is not clear how the company became a party to the claim, but the Board found that the company's workers' compensation carrier completed a report of injury.

The Board proceedings focused on the existence of an employment relationship and the identity of Amos's employer. At one point all parties agreed to dismiss Plambeck Floor Customs as a party, but this stipulation allowed the issue to be reopened. Tidwell later filed a petition to rejoin the company,[11] and Plambeck Floor Customs was rejoined as a party. During the time the company was not a party to the proceeding, the Fund and Amos signed a stipulation to dismiss Travis individually as a party, but Tidwell did not sign it and Travis remained a party.

Travis individually and Tidwell both filed petitions to dismiss Amos's claim; both alleged that they did not hire Amos. The Board held a hearing on both petitions in September 2021 and included as a hearing issue who should be a party to the claim. At the beginning of the hearing the parties were Amos, Tidwell, Plambeck Floor Customs, Travis (individually), and the Fund. Only Tidwell was unrepresented at the hearing. Travis, Tidwell, and Amos all testified, as did Tabitha and Bressette. The Board had documentary evidence the parties filed as well as Tidwell's and Amos's depositions.

During the litigation Tidwell took inconsistent positions about a possible relationship between the shop construction and Plambeck Floor Customs and Travis. Tidwell said Travis was "the acting general contractor" on the shop project. Tidwell said at a prehearing conference that he had been on the payroll at the company when Amos was injured and so did not understand why he would be an employer. Tidwell later disclaimed any link between the company and the shop construction.

---

[11]     Tidwell obtained a vendor receipt showing that Travis paid for some of the shop construction materials with the company's credit card rather than his personal card, and Tidwell asked the Board to rejoin the company to the claim, attaching receipts, evidently intending to suggest that some materials ordered by Plambeck Floor Customs were related to the shop construction. Shortly afterwards Plambeck Floor Customs filed a workers' compensation fraud petition against Tidwell, but took no further action on it.

At the hearing Tidwell, Travis, and the company all advanced the theory that the shop construction project was a "buddy deal" — just friends helping friends. Amos's theory was that he was not an independent contractor but an employee of some employer, certainly Tidwell but also possibly Travis or Plambeck Floor Customs.[12] The Fund argued that Tidwell was Amos's direct employer but also contended Plambeck Floor Customs was Amos's special or joint employer and thus liable.[13] The Fund maintained that Tidwell's "mindset" that he was helping Amos as a friend did not prevent his classification as an "employer" under Alaska law.

As relevant to this appeal, Tabitha testified generally about Tidwell's pay stubs and the way he was paid. Travis testified about his duties at the company and the formation of the contract with Tidwell to build the shop. He also testified that he had not hired Amos and had not known him before the accident, that he understood Tidwell would need help on the shop construction, and that the shop construction was a "buddy deal." Both Tabitha and Travis testified that they had not created an opening in Tidwell's work schedule so that he could build the shop; they said Tidwell had no flooring-company work assignments during that time period because there was not enough work for all their workers and Tidwell had low priority for assignments. Amos testified about his work with Tidwell, his general work background, how he came to work on the shop project, and his work on that project. Tidwell provided narrative testimony denying he was a contractor or Amos's employer. He said he was "not employed" on the shop construction, but was "a friend helping a friend, just like

---

[12]     Amos argued that Travis was a "project owner" under AS 23.30.045(f)(2) because Travis had contracted with Tidwell to build the shop and the shop had some connection to the business. Amos argued generally that Tidwell continued to work as a contractor after he discontinued his remodeling business even though he no longer was licensed.

[13]     *See Kroll v. Reeser*, 655 P.2d 753, 756 (Alaska 1982) (discussing special employment in workers' compensation law).

someone off of Craigslist or Facebook to come shovel your driveway." Tidwell said he "told [Amos] up front this [was] a cash job," that he was "helping a buddy."

In its decision, the Board dismissed Amos's claims against Tidwell and Travis, and it also dismissed Plambeck Floor Customs and the Fund as parties. The Board decided that Travis and Tabitha were credible and that the shop construction was unrelated to the business. The Board made no findings about the agreement between Travis and Tidwell, nor did it reach any conclusions about what their legal relationship might be with respect to the shop construction. Because the shop was not related to the business and was built for Travis's personal use, he was neither an "employer" nor a "project owner" as those terms are defined in the Act, and Amos's claim against Travis was dismissed. The Board rejected arguments that tied Plambeck Floor Customs to the project and decided the business should be dismissed as a party. No one appealed either of these decisions.

The Board decided that "some species" of employment relationship existed between Amos and Tidwell based on their testimony: although the details varied slightly, they both testified that Tidwell offered Amos money to work on the shop construction and that Amos accepted this offer and worked on the shop. The Board said that as in *Kroll v. Reeser*,[14] "Tidwell was also arguably operating as an unlicensed contractor" in the shop construction, noting that "[i]n exchange for Plambeck's promise to pay him $6,000, Tidwell undertook the performance of building Plambeck's shop and hired Amos in the process."[15] Quoting *Kroll*, the Board said Amos was "obviously

---

[14]     655 P.2d 753 (Alaska 1982).

[15]     *Cf.* AS 23.30.045(f)(1) (defining "contractor" as "a person who undertakes by contract performance of certain work for another").

an employee,"[16] but decided Tidwell was not an "employer" under the Act because it thought that Tidwell hired Amos out of friendship.

The Board did not make any findings about Tidwell's side jobs. The Board focused instead on actions Tidwell had taken at other times to assist Travis, such as "fixing the taillights on [Travis's] van," and on Tidwell's gifts — including a dog — to Amos. The Board did not explain how these actions were relevant to whether Tidwell's employment of Amos on the shop project was in connection with a business or industry except to say that as a policy matter "friendship is not a route through which the costs of industrial accidents should be channeled." To justify this exemption, the Board cited two authorities: (1) our use of Larson's treatise in a case about independent contractor status[17] and (2) the fact that in *Kang* the injured worker described his employment as "doing . . . a favor as a friend."[18] The Board did not set out any factors to constrain or guide application of this exemption in future cases.

The Board decided Tidwell's "regular work" was "as a piecemeal flooring installer" at Plambeck Floor Customs. It stated that even though "helping Amos, as well as other friends, . . . may have been regular activities for Tidwell, they were not in connection with any business or industry of his own, and since Amos's work on the shop was not a regular part of Tidwell's regular work, Tidwell was not an 'employer' under the Act." It dismissed Amos's claim against Tidwell and then dismissed the Fund as a party because Amos had no "employer" for purposes of workers' compensation.

---

[16]     *Kroll*, 655 P.2d at 755 (stating that injured worker was "obviously an employee," with question being his employer's identity).

[17]     The Board cited *Searfus v. N. Gas Co.*, 472 P.2d 966 (Alaska 1970), where we adopted the relative nature of the work test to distinguish employees from independent contractors.

[18]     420 P.3d 1210, 1213 (Alaska 2018).

Amos appealed to the Commission, limiting his appeal to the Board's decisions about Tidwell and its dismissal of the Fund. Plambeck Floor Customs, its insurer, and Travis individually asked the Commission to dismiss them as parties. No one opposed the motion, and they were dismissed. The Fund remained a party to the appeal but did not file a brief, oppose the dismissal motions, or present an oral argument.

Amos argued that "there is no such thing as a 'buddy' exemption to the employer-employee relationship" and therefore the Board's decision was legally erroneous. He contended the Board relied on a number of "irrelevant" facts to determine Tidwell was not Amos's employer and ignored facts showing that Tidwell was engaged in a contracting business when he employed Amos on the shop project. Amos additionally argued that the Board's "newly adopted" policy was contrary to the Act because it would allow employers to escape compensation liability when an employer convinced the Board he was a friend of the employee.

Tidwell's brief largely copied word-for-word portions of the Board's decision. In the part with his own statements, Tidwell contended he "was simply helping Travis Plambeck, a friend, on his personal project . . . not related to or in connection with any business/industry of his or Travis's." At oral argument before the Commission, he said that both he and Amos had "worked numerous cash jobs," that "extra cash work on the side helps pay the bills," and "when you do side work for cash for friends you have to be . . . responsible for your own safety." He compared the shop project to hiring "the kid down the street to cut your grass."

The Commission affirmed the Board's decision. In both its summary of the case and its legal discussion, the Commission summarized testimony from hearings and depositions rather than repeating or paraphrasing the Board's findings. As we explain shortly, the Commission's summaries in both parts of its decision contain inaccuracies that are at times directly contrary to the Board's decision; the inconsistencies present some difficulties in analyzing the issues in this appeal because the parties interpret the Commission's actions differently. In our own summary of the

Commission's decision, we rely on the Commission's statements but note when the Board's decision differs.

The Commission divided its legal analysis into two parts: whether Tidwell was an employer and whether Amos was an employee. In its discussion of Tidwell's status, the Commission concluded Tidwell's activities were "consumptive" rather than "productive" because of the following: (1) there was "no evidence" of Tidwell having "any regular business as a handyman or construction contractor" and "no indicia" that Tidwell "owned a business which necessitated his purchase of workers' compensation insurance";[19] (2) "[t]here were no customers for any of the activities [Tidwell] provided to Mr. Amos";[20] (3) "there was no business operated by Mr. Tidwell";[21] (4) Tidwell "was sometimes paid for his activities, but just as frequently these activities were for free";[22] and (5) "the Board found no contract of employment existed whether implied or express" between Amos and Tidwell.[23] The Commission decided that substantial evidence supported the Board's finding that Tidwell's activities

---

[19] The Board acknowledged in its decision that Tidwell was "arguably operating as an unlicensed contractor" during the shop construction project. It did not elaborate on this statement, nor did its legal analysis discuss Tidwell's and Travis's testimony about Tidwell's side jobs.

[20] The Board noted the agreement between Tidwell and Travis for the shop's construction as well as testimony from both Travis and Tidwell that Travis paid Tidwell $3,000 for partial completion of the project.

[21] *See supra* note 19.

[22] The Commission did not say what activities it referred to or how this would be relevant to the case.

[23] The Board actually concluded the exact opposite, rejecting Tidwell's "protestations he did not hire or employ Amos" and concluding based in part on Tidwell's own testimony that "some species of an employer-employee relationship existed between Tidwell and Amos."

"vis a vis" Amos were consumptive rather than productive but did not consider whether the shop construction was a productive or consumptive use of Amos's labor.[24]

The Commission's discussion of Amos's status as an employee included legal rationales that the Board had not mentioned in its decision and the parties did not raise in their briefs before the Commission. The Commission noted that AS 23.30.230 "specifically exempts harvest help and other similar part-time or transient help." It then provided the Board's regulatory definition of "part-time help" and concluded that the "definition seems to apply to the work on the shed."[25] The Commission did not explain whether Amos's work when he was injured needed to be similar to "harvest help," and if it did, how it was similar.[26] The Commission also discussed a part of Larson's treatise related to statutory exemptions for "casual work" that some states have adopted,[27] even though the Commission recognized that Alaska's workers' compensation statute does not have this exemption. Finally, alluding to American "history or custom" that involved "a long history of friends and neighbors helping others from barn-raising to deck construction," the Commission decided there was "implicit exemption in the Act for 'buddies' " and that "[t]his kind of work falls squarely within the 'consumptive activities' that [the supreme c]ourt has already declared not covered by the Act."

Amos appeals.

---

[24] The Commission also mischaracterized Plambeck Floor Customs' brief as "testimony," citing the Board's finding about the brief as a finding about the company's "testimony."

[25] The record uses the terms "shed" and "shop" interchangeably to refer to the project.

[26] *See Schultz v. Hinchey*, AWCB Dec. No. 19-0120, 2019 WL 6307569, at *11 (Nov. 19, 2019) (construing 8 Alaska Administrative Code (AAC) 45.900(c), which defines "part time help," as applying only to baby sitters or occupations that are similar to harvest help due to statutory language).

[27] 6 A. LARSON ET AL., LARSON'S WORKERS' COMPENSATION LAW § 73.01 (Matthew Bender rev. ed. 2023).

## III. STANDARD OF REVIEW

"In an appeal from the Commission, we review the Commission's decision and not the Board's."[28] "We apply our independent judgment to questions of law that do not involve agency expertise, including issues of statutory interpretation."[29] We independently review the Commission's conclusions about substantial evidence supporting the Board's decision by "independently review[ing] the record and the Board's factual findings."[30] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[31] We review de novo the Commission's conclusion that a person is an employer.[32]

## IV. DISCUSSION

### A. The Commission's Role

Before beginning our analysis of this case, we summarize the Commission's role in the workers' compensation system because the parties' arguments and the decision on appeal suggest some misunderstanding of that role.

The Commission was created as the first level of appellate review for workers' compensation decisions. The legislature intended to speed the appellate process for workers' compensation cases and to "provide necessary expertise and

---

[28] *Mitchell v. United Parcel Serv.*, 498 P.3d 1029, 1039 (Alaska 2021) (quoting *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1121 (Alaska 2017)).

[29] *Vandenberg v. State, Dep't of Health & Soc. Servs.*, 371 P.3d 602, 606 (Alaska 2016) (quoting *Monzulla v. Voorhees Concrete Cutting*, 254 P.3d 341, 343-44 (Alaska 2011)).

[30] *Smith v. CSK Auto, Inc.*, 204 P.3d 1001, 1007 (Alaska 2009).

[31] *Mitchell*, 498 P.3d at 1039 (quoting *Vue v. Walmart Assocs., Inc.*, 475 P.3d 270, 279 (Alaska 2020)).

[32] *Cf. Kang v. Mullins*, 420 P.3d 1210, 1214-15 (Alaska 2018) ("We review de novo 'the legal determination of whether the[] facts [about employment status] amount to employment under the statute.' " (alterations in original) (quoting *Nickels v. Napolilli*, 29 P.3d 242, 247 (Alaska 2001))).

thereby improve the appeals process" in workers' compensation.[33] We have interpreted the statutes creating the Commission as providing litigants with "the same procedural rights of review" that they had in superior court appeals.[34] The Act sets out standards of review the Commission must apply to Board decisions and limits the Commission's ability to receive evidence on appeal.[35] It requires the Commission to review the Board's factual findings to see whether they are supported by substantial evidence.[36] The Commission is empowered to "affirm, reverse, or modify" a Board decision as well as to "remand matters [the Commission] determines were improperly, incompletely, or otherwise insufficiently developed."[37] The Commission has previously interpreted this language to require the Commission to remand matters to the Board when the Board did not make findings the Commission deems essential.[38] These Commission decisions are consistent with our precedent, which limits an appellate court's ability to make findings that might "fill the gap" when the Board fails to make findings on issues that

---

[33]     *Alaska Pub. Int. Rsch. Grp. v. State*, 167 P.3d 27, 39 (Alaska 2007).

[34]     *Monzulla*, 254 P.3d at 347.

[35]     AS 23.30.128(b)-(c).

[36]     AS 23.30.128(b). The legislature changed the original proposal about the Commission's power to review the Board's factual findings from de novo review to substantial evidence review. *Compare* Senate Bill (S.B.) 130 § 31, 24th Leg., 1st Sess. (Mar. 3, 2005), *with* C.S.S.B. 130(FIN) am § 33, 24th Leg., 1st Sess. (Apr. 12, 2005).

[37]     AS 23.30.128(d).

[38]     *See, e.g.*, *Marsh Creek, LLC v. Benston*, AWCAC Dec. No. 101, at 23 n.49 (Mar. 13, 2009), https://labor.alaska.gov/WCcomm/memos-finals/D_101.pdf ("The [C]ommission may not make findings of fact on the appealed claim. Where . . . the facts were disputed, the credibility of witnesses challenged, and there is evidence in the record that supports different versions of events, the [C]ommission remands the case to the [B]oard for further fact findings."); *Tire Distrib. Sys., Inc. v. Chesser*, AWCAC Dec. No. 90, at 15 (Oct. 10, 2008), https://labor.alaska.gov/WCcomm/memos-finals/D_090.pdf ("If the [B]oard's findings or conclusions are insufficient to permit intelligent appellate review, the [C]ommission will remand the case to the [B]oard for further deliberation.").

are both material and contested.[39]  We have construed AS 23.30.008(a), which gives a Commission decision "the force of legal precedent" unless we reverse it, as binding not only the Board but also the Commission itself.[40]  The current Commission is thus bound by the earlier Commissions' interpretation of the Act as limiting the Commission's ability to make factual findings.

In deciding Amos's appeal, the Commission explicitly stated it made "no factual findings" and that it "state[d] the facts as found by the Board, adding context by citation to the record with respect to matters that do not appear to be in dispute."  But as set out above the Commission's decision differs from the Board's in some important respects.[41]  The Commission's decision includes factual assertions important to its reasoning that have no citation to the record or to the Board's decision, making it impossible to identify their source.  And several of the Commission's citations to the Board decision are inaccurate.

The parties take different views of whether the Commission engaged in fact finding to resolve the appeal.  Amos argues that certain Commission "findings" are not supported by substantial evidence in the record but does not address whether the Commission can make "findings" that either are contrary to the Board's findings or were never decided by the Board.  The Fund parrots the Commission's assertion that it made no new factual findings but does not otherwise address Amos's arguments about the Commission's "findings."  The argument portion of Tidwell's brief is mainly a verbatim repetition of parts of the Commission decision; consequently his brief repeats certain erroneous assertions but does not otherwise address Amos's arguments.

---

**39**     *Bolieu v. Our Lady of Compassion Care Ctr.*, 983 P.2d 1270, 1275 (Alaska 1999).

**40**     *Alaska Pub. Int. Rsch. Grp. v. State*, 167 P.3d 27, 43-44 (Alaska 2007).

**41**     *See supra* notes 19-24 and accompanying text.

The Commission did not indicate that it was reversing any part of the Board's decision, and its conclusion affirms the decision. But the Commission's conclusions that substantial evidence supported the Board's decisions about Amos's status as an employee and Tidwell's status as an employer present us with a dilemma when the Board did not make some of the "findings" the Commission discussed. For the most part we interpret the Commission's erroneous statements in deciding this case as mistakes rather than independent findings of fact, even though certain statements reflect a significant misreading of the Board's decision. But the Commission necessarily needed to make findings if it intended sua sponte to apply AS 23.30.230(a)(3), which exempts "harvest help and similar part-time and transient help," and the Board's related regulation because the Board did not apply them in its decision, and findings of fact are necessary to determine whether the statute's and regulation's requirements are met.[42]

In sum, the Commission's role is not to make new findings based on evidence presented to the Board, even to fill a gap in the Board's findings. Because our standard of review for factual findings requires us to independently review the record and the Board's findings, we will consider the Board's findings, not the Commission's interpretation of the evidence, to address the parties' differing views of the underlying facts and the legal conclusions that follow from them.

## B. It Was Error To Create An Exemption For Employers Who Are "Buddies" Of Their Employees.

Amos argues that the Commission exceeded its powers in creating a "buddy" exception to the Act. The Fund's sole argument related to this issue asserts that creation of the exemption "offers no reason to reverse the Commission's decision" because of the Fund's view that the Commission correctly applied our precedents about

---

[42] We address Amos's appeal point about the regulation later in this decision.

consumptive activities. Tidwell's brief simply copies the Commission's decision that the Act has "an implicit exemption . . . for 'buddies.' "

In *Nickels v. Napolilli* we rejected the employers' request that we construe AS 23.30.230(b) as allowing us to create a new exemption to the Act for "homesteaders with small family farms."[43] We agreed with the employee that "Alaska's statutory workers' compensation scheme unambiguously appoints the *legislature* . . . with the duty of defining exempt categories of employees."[44] The legislature had not created an exemption for farm workers, and we determined that we would exceed our powers if we did so.[45]

The same rule applies here. The Commission's stated rationale for creating the "buddy" exemption was what it saw as a "history or custom" in the United States "of friends and neighbors helping others from barn-raising to deck construction." The Commission did not acknowledge that the project Amos was working on when he was injured was not such a group working unpaid on a project.[46] The uncontested evidence showed that Travis agreed to pay Tidwell $6,000 to build the shop (and did in fact pay him half of this amount after Tidwell did not complete the project) and that Tidwell agreed to pay Amos for his work on the shop. Tidwell's failure to pay Amos in cash after the accident does not transform an employment relationship into volunteer work for a friend or neighbor.

---

[43]     29 P.3d 242, 253-54 (Alaska 2001).

[44]     *Id.* at 254 (emphasis added).

[45]     *Id.*

[46]     *Cf. City of Seward v. Wisdom*, 413 P.2d 931, 938 (Alaska 1966) (describing as "significant" to decision that no employment contract existed the fact that decedent "volunteered to help without any request for, or having received any assurance of, remuneration for his services"); *see also* 5 A. LARSON ET AL., *supra* note 27, § 65.01 (discussing importance of payment to concept of employment for workers' compensation coverage); *id.* § 65.03 (discussing types of nonmonetary payment that may satisfy payment requirement to show employment).

It is unclear whether the Commission's failure to recognize a difference between unpaid projects and Tidwell's employment of Amos for the shop project arose from the Commission's mistake about the existence of an employment relationship between Tidwell and Amos. As Amos points out, the Board determined that "some species of an employer-employee relationship existed between Tidwell and Amos." The Board set out Amos's and Tidwell's testimony about Tidwell hiring Amos, which included an offer of work, acceptance of the offer, and an agreement that Amos would receive a portion of the money Travis was to pay Tidwell. The Board also relied on text messages showing that Tidwell supervised Amos during the shop project to support its conclusion about an employment relationship. Nothing in the Commission's decision suggests that these findings were erroneous, so it appears the Commission was simply mistaken about what the Board found. But because Amos has asked us to consider whether substantial evidence supported the Commission's "finding" and because the Commission wrote that there was no employment relationship, we consider whether substantial evidence supports the Board's findings that underlie its conclusion about an employment relationship between Tidwell and Amos.[47] The Board's findings are supported by both Amos's and Tidwell's testimony. Because the Board's findings have support in the record, we conclude that there was an employment relationship between Tidwell and Amos.

Whatever the reason for the Commission's statement about the employment relationship between the two men, we agree with Amos that the Commission acted beyond its power when it recognized an "implicit exemption" to the Act's coverage for "buddies" who have employment contracts with their friends. We also agree with Amos that allowing such an exemption contravenes public policy and the Act's language. Neither the Commission nor the Board set any limits on the

_____

[47] *See Smith v. CSK Auto, Inc.*, 204 P.3d 1001, 1007 (Alaska 2009) (setting out standard of review for findings of fact).

"buddy" exemption to guide future application of this novel exception to the Act's coverage. The Act requires that it be interpreted so as to "ensure the quick, efficient, fair, and predictable delivery" of compensation.[48] When the Legislature amended the workers' compensation scheme to explicitly exclude independent contractors, it did so to clarify and provide guidance to employers so that they would know whether they needed to carry compensation coverage.[49] The Commission's creation of a vague exemption for "buddies" that can only be applied after an injury inserts confusion and uncertainty for both employers and employees. And it exceeds the agencies' powers. The Commission erred by creating a "buddy" exemption for employment contracts between friends.

### C. It Was Error To Apply The Productive/Consumptive Distinction To Tidwell's Employment Of Amos.

Amos contends that the Commission incorrectly applied the distinction between productive and consumptive uses of labor in employment situations because the distinction applies only to property owners. The Fund responds that substantial evidence supports the Commission's conclusion, asserting that neither administrative agency "erred by concluding that the costs of industrial accidents should not be channeled through friendship." Tidwell's brief contains the Commission's discussion of this issue without elaboration or additional argument.

The Commission and the Board relied on the productive/consumptive distinction, which we adopted in *Kroll v. Reeser*,[50] to analyze this case. The Act's definition of "employer" includes "a person employing one or more persons in

---

[48]    AS 23.30.001(1).

[49]    *See, e.g.*, Minutes, H. Lab. & Com. Comm. Hearing on H.B. 79, 30th Leg., 1st Sess. 4:34:41-4:39:21 PM (Mar. 6, 2017) (testimony of Marie Marx, Dir., Div. of Workers' Comp.) (explaining that "multi-factor tests" have resulted in "misclassification and confusion for employers" as well as "complications").

[50]    655 P.2d 753 (Alaska 1982).

connection with a business or industry coming within the scope of [the Act] and carried on in this state."[51] In *Kroll* we cited Larson's treatise and construed the phrase "in connection with a business or industry" as excluding activities that we labelled "consumptive";[52] these activities are included in Larson's discussion of "nonbusiness employments."[53]

Larson's treatise discusses an exemption for consumer-employers that applies only to "householders"[54] who hire workers to perform tasks at or related to their personal residences.[55] The distinction stems from the theory in workers' compensation that businesses in a specific industry can pass on to that industry's customers the cost of workers' compensation coverage.[56] Householders, even those who may have a business with compensation coverage, are not producers of goods or services when they employ someone at their homes for their personal benefit.[57] The treatise provides a number of examples of the types of employment contracts that a householder might

---

[51]     AS 23.30.395(20).

[52]     655 P.2d at 757 (citing 1C A. LARSON, THE LAW OF WORKMEN'S COMPENSATION § 50.21, at 9-70 to 9-71 & nn.4-5 (1980)).

[53]     6 A. LARSON ET AL., *supra* note 27, § 72.02.

[54]     A "householder" is defined as a person "who occupies or owns a house," *Householder*, WEBSTER'S II NEW COLLEGE DICTIONARY (3d ed. 2005). In other words, a householder is a homeowner or a tenant.

[55]     6 A. LARSON ET AL., *supra* note 27, § 72.02[1].

[56]     *Id.* § 72.02[5], at 72-11; *see also Searfus v. N. Gas Co.*, 472 P.2d 966, 969 (Alaska 1970) ("Professor Larson states that the theory of compensation legislation is that the costs of all industrial accidents should be borne by the consumer as part of the cost of the product." (citing 1A A. LARSON, THE LAW OF WORKMEN'S COMPENSATION § 43.51, at 633 (1967))).

[57]     *See* 6 A. LARSON ET AL., *supra* note 27, § 72.02[2], at 72-7 ("[T]he courts will not ordinarily find in the compensation act coverage of work undertaken by a person as . . . a consumer instead of a producer.").

enter into as a consumer, including hiring "a young neighbor to mow [the] lawn" or a "practical nurse to stay with a sick child."[58]

We recognized the distinction's limitation to householders in *Nickels v. Napolilli*: "A homeowner who hires someone to perform an odd job for his own benefit is not appropriately considered an employer under the workers' compensation statute."[59] In *Nickels* we upheld a determination that a home-based farm business was an employer for purposes of workers' compensation, even though the couple who employed the injured worker had other jobs and characterized their farm as "a lifestyle choice."[60] We reiterated the policy rationale for the consumptive/productive distinction, writing that "[a] business, unlike a homeowner, can pass the cost of workers' compensation insurance on to the consumers of the business's service or product."[61] We agreed with the superior court that the injured worker's tasks "furthered the business," even if the home-based farm business was not the employers' primary income source.[62]

Our precedents discussing the productive/consumptive distinction have all involved householders; indeed, with one exception where the householder was a tenant,[63] the householders have been homeowners who hired others to work at their residences.[64] The treatise recognizes that problems applying the productive/

---

[58]    *Id.* § 72.02[1], at 72-4.

[59]    29 P.3d 242, 253 (Alaska 2001).

[60]    *Id.*

[61]    *Id.*

[62]    *Id.*

[63]    *Kang v. Mullins*, 420 P.3d 1210, 1212 (Alaska 2018) (tenant who used property for both business and personal residence).

[64]    *Kroll v. Reeser*, 655 P.2d 753, 754 (Alaska 1982) (homeowner building four-plex with plan to occupy one unit and rent other three); *Nickels*, 29 P.3d at 245

consumptive distinction can arise when householders have "work done on a property from which [they] derive[] some income."[65]  Again, our precedents reflect this:  with the exception of *Gaede v. Saunders*, all of our cases applying this distinction have involved householder-employers who derived some income from their residences.[66]

In this case, the Board applied the productive/consumptive distinction to Travis and found that the shop project was a personal project at Travis's home and was not connected to Plambeck Floor Customs.  The Board concluded that Travis was neither Amos's employer nor a "project owner" and thus was not potentially liable for workers' compensation to Amos under AS 23.30.045.  These findings disposed of the claim against Travis individually, and Amos did not appeal this part of the decision.  In fact, Amos acknowledges in his brief before us that Travis's actions with respect to the shop were consumptive.  But he contrasts Travis's activity on the project with Tidwell's, asserting that Tidwell "contracted to provide services in exchange for payment."

Neither the Board nor the Commission understood the limited applicability of the productive/consumptive rule, and both erred in applying the rule to Tidwell in this case.  Tidwell was not a householder or homeowner with respect to the shop project because Tidwell hired Amos to perform work at the Plambecks' property.  At the Board hearing, Tidwell compared his employment of Amos for the shop project to hiring "someone off of Craigslist or Facebook to come shovel your driveway," and

---

(homeowners with farm business on property); *Gaede v. Saunders*, 53 P.3d 1126, 1126 (Alaska 2001) (homeowners "hired workers" for home construction project); *Adams v. State, Workers' Comp. Benefits Guar. Fund*, 467 P.3d 1053, 1063 (Alaska 2020) (homeowner who rented out part of house); *cf. Trudell v. Hibbert*, 272 P.3d 331, 342 (Alaska 2012) (considering productive/consumptive distinction in context of "project owner" status where homeowners rented home to their taxi business).

[65]     6 A. LARSON ET AL., *supra* note 27, § 72.02[4], at 72-10.

[66]     *See supra* notes 63-64.

at oral argument before the Commission he likened it to employing "the kid down the street to cut your grass." But these comparisons misunderstand the distinction. A householder who hires someone to shovel *his own* driveway may appropriately argue that he is not an "employer" as defined in the Act because he himself has hired that person and is using that person's labor as a consumer, to maintain his home. The same is true for a homeowner who hires someone to mow the lawn at his home. But a snow-removal contractor is not exempt from the Act when he hires someone to shovel other people's driveways, and a landscaper must provide workers' compensation coverage to workers hired to mow others' lawns. The productive/consumptive distinction did not apply to Tidwell's activities on the shop because the project was not a project personal to him, built on his property. On the contrary, Travis promised to pay Tidwell $6,000 for the shop construction and in fact paid him $3,000 after Tidwell was unable to complete the project.

The Fund implies, without citation to any legal authority, that Amos's concession that Travis's use of labor on the shop project was consumptive means that Amos concedes the project was "a deal between friends" and therefore the "project was not related to [Tidwell's] business of taking side-jobs if one existed." Because the Act has no exemption for employment contracts between friends, the Fund's argument fails. But applying the Fund's logic more broadly — evaluating the productive/consumptive distinction by considering only the purpose of the project and ignoring the identity of the putative employer — would exempt from the Act any construction contractor whom a homeowner hires to build, remodel, or repair his home, even if the contractor had employees. Nothing in the Act or our precedent supports this, and accepting it would exempt a segment of the construction industry that can and does pass on to consumers the cost of compensation coverage. The productive/consumptive distinction comes from the Act's definition of "employer" and is therefore related to the putative employer's identity as well as the purpose of the work. In this case, Tidwell, not the householder Travis, had "some species" of employment relationship with Amos.

Tidwell's employment of Amos to work on the Plambecks' property was, as a matter of law, not within the rule we adopted in *Kroll*.

**D.  The Agencies Did Not Apply The Relative Nature Of The Work Test But They Misunderstood Our Precedent.**

In earlier cases, we held that independent contractors were not employees for purposes of the Act and adopted the relative nature of the work test from Larson's treatise to use in evaluating an injured worker's status as an independent contractor.[67] The legislature in 2018 added "independent contractor" to the list of persons not covered by the Act and set out requirements for classification as an independent contractor under AS 23.30.230.[68]

Currently AS 23.30.395(19) defines "employee" as "a person who is not an independent contractor as described in AS 23.30.230 and who, under a contract of hire, express or implied, is employed by an employer."  Amos contends the Board and the Commission erroneously applied the relative nature of the work test when evaluating whether Tidwell was his employer because they considered whether Amos was "engaged in work which was 'a regular part of the employer's regular work,' "[69] one part of the relative nature of the work test.[70]  The Fund responds that neither administrative agency applied the relative nature of the work test, deciding simply that Tidwell was not engaged in a business or industry.  In the Fund's view, there was no error because the definition of "employer" includes "a business or industry"

---

[67]  *See Searfus v. N. Gas Co.*, 472 P.2d 966, 969 (Alaska 1970); *Ostrem v. Alaska Workmen's Comp. Bd.*, 511 P.2d 1061, 1063-64 (Alaska 1973).

[68]  Ch. 91, § 17, SLA 2018.

[69]  *Kroll v. Reeser*, 655 P.2d 753, 757 (Alaska 1982) (quoting *Ostrem*, 511 P.2d at 1063).

[70]  *See Ostrem*, 511 P.2d at 1063 (setting out six factors for relative nature of the work test).

requirement and the Board appropriately decided that Tidwell's activities were consumptive rather than productive. Tidwell did not address this argument in his brief.

The Board's decision relied on *Kroll* to evaluate whether Tidwell was Amos's employer, finding that "Tidwell's 'regular work' was his employment as a piecemeal flooring installer at [Plambeck Floor Customs]." It relied on this finding to conclude that Tidwell was not an employer as defined in the Act, writing that "Amos's work on the shop was not a regular part of Tidwell's regular work."

The Board misapplied *Kroll*. As the Fund points out, in *Kroll* we gave two different reasons why it was important to determine whether Kroll was an employer: "as a precondition to the application of the Act *and* as an element of the relative nature of the work test."[71] Here the Board apparently merged the two factors into one question related to the productive/consumptive distinction. More importantly, though, the Board concluded that Tidwell's full-time employment at Travis's company was the only relevant business or industry for purposes of deciding whether Tidwell had employed Amos "in connection with a business or industry." This conclusion misunderstands our precedent: a person who has a second or side business can still be an employer for purposes of the Act.[72] The employment needs to be "in connection with" the employer's business under the statutory definition,[73] but the business does not need to be the putative employer's sole or primary income source.

---

[71]     *Kroll*, 655 P.2d at 756-57 (emphasis added).

[72]     *Nickels v. Napolilli*, 29 P.3d 242, 252-53 (Alaska 2001) (affirming decision that homeowners who worked full time at other jobs but had farm business were employers under Act); *see also Kroll*, 655 P.2d at 754, 757 (remanding for Board to consider whether cable TV serviceman who was "[i]n his spare time . . . helping to build a four-plex" was employer under the Act).

[73]     *See Kang v. Mullins*, 420 P.3d 1210, 1216-17 (Alaska 2018) (concluding that major repair to leased building was not connected to massage business in absence of evidence that tenant assumed responsibility for major repairs).

The Board did not apply the relative nature of the work test to determine Amos's employment status, but its finding that Tidwell's employment at Plambeck Floor Customs was his regular or primary job misunderstood our precedent. Here Amos argued that Tidwell had a side business as a handyman or contractor even while he worked at Plambeck Floor Customs. The Board's misunderstanding of *Kroll* appears to have contributed to the Board's failure to make necessary findings about Amos's allegations related to Tidwell's side work.

### E.     The Board Did Not Make Adequate Findings.

As we have just noted, Amos alleged that Tidwell employed him as part of an unlicensed handyman or construction business. The Board stated that Tidwell was "arguably operating as an unlicensed contractor here," but rather than make findings about the evidence of this, it created a novel exemption to the Act and made multiple findings related to the parties' friendships. Those findings were largely irrelevant to the question facing the Board.

The parties to this appeal base their arguments on different views of the evidence. The Fund, possibly relying on the Commission's erroneous statements, asserts the record contains no evidence showing "that Tidwell was engaged in any business in which he could pass on the cost of insurance to consumers." Amos argues that substantial evidence demonstrates that Tidwell "engaged in a handyman or side job business," making him an employer under the Act.

The Board's acknowledgement that Tidwell was "arguably operating as an unlicensed contractor" demonstrates that *some* evidence existed showing that Tidwell was operating a business that could have passed on the cost of workers' compensation insurance to consumers; after all, licensed construction contractors who

have employees must provide compensation coverage.[74]  The Board sidestepped making findings related to this issue by creating a new exemption to the Act and focusing on the personal relationships among the parties.  Whether someone is an employer under the Act is a legal determination that must be made based on factual findings.[75]  The Board failed to make adequate findings about a material and contested issue, creating a gap that we cannot fill.[76]

The Act defines an employer in relevant part as "a person employing one or more persons in connection with a business or industry coming within the scope of [the Act] and carried on in this state."[77]  The Board decided that Tidwell employed Amos for the shop construction project; substantial evidence supports that finding.  It is uncontested that the project was done in Alaska.  The Board needs to evaluate the evidence to determine whether Tidwell's employment of Amos was "in connection with a business or industry," keeping in mind that "[a] business is not exempt from providing workers' compensation coverage simply because it has little income."[78]  Likewise, failure to be licensed does not preclude classification as an employer.[79]  Having a full-

---

[74]    Some evidence that could support a finding that Tidwell was engaged in a business follows.  Tidwell answered questions about his side work at his deposition, testifying that he was generally paid cash for this work unless it was for a contractor he knew.  When asked whether he "would . . . have needed to hire someone to also work with [him]" if Travis had agreed to pay $10,000 to $12,000 for the shop project, Tidwell said he "would have called in another contractor friend of mine and went in there with his whole crew and done it in a short period of time."  Tidwell said that at the higher price "it would have been something [he] would have done legitimately."

[75]    *Nickels*, 29 P.3d at 247.

[76]    *Bolieu v. Our Lady of Compassion Care Ctr.*, 983 P.2d 1270, 1275 (Alaska 1999).

[77]    AS 23.30.395(20).

[78]    *Adams v. State, Workers' Comp. Benefits Guar. Fund*, 467 P.3d 1053, 1063 (Alaska 2020).

[79]    *Id.*

time job elsewhere does not exempt someone from being an "employer."[80] And comparisons between Tidwell's income from his job at Plambeck Floor Customs and the amount he earned from side jobs are not relevant to the question whether the shop construction project was "in connection with a business or industry." Payment in cash also does not exempt work from the Act's coverage, as Tidwell's argument before the Commission suggested; cash payment does not transform work into something that is not a business or industry. Finally, a sole proprietor runs a "business" that must provide compensation coverage for its employees, even if coverage for the business owner himself is not required.[81] On remand the Board needs to focus on the allegations that Tidwell was engaged in some type of handyman or contractor business when he did side work and specifically when he was working on the Plambecks' shop project where he employed Amos.

### F. It Was Error To Speculate About The Applicability Of AS 23.30.230(a)(3) Or To Make Findings About It.

Before the Board, Plambeck Floor Customs raised the question whether AS 23.30.230(a)(3), about "harvest help and similar part-time or transient help," and 8 AAC 45.900(c),[82] the Board's related regulation, applied to Amos's claim. Amos

---

[80] *Nickels*, 29 P.3d at 245, 252-54 (affirming decision that couple with full-time work elsewhere were "employers" under Act because of their side business running a farm).

[81] *See Kang v. Mullins*, 420 P.3d 1210, 1212 n.1 (Alaska 2018) (explaining that sole proprietorship was not required to have compensation insurance "as long as it had no employees").

[82] 8 AAC 45.900(c) provides:

In AS 23.30.230,

(1) "part-time help" means a person who on an intermittent, irregular, noncontinuous basis performs work which is either not an integral part of the regular business of

contested their applicability. The Board's decision did not mention either this statutory subsection or the regulation. No party asked the Commission to consider the statute's or regulation's applicability.

> In its discussion of Amos's status as an employee, the Commission wrote:

> The Act, at AS 23.30.230, specifically exempts "harvest help and similar part-time or transient help." The Board's regulation defines part-time help as "a person who on an intermittent, irregular, noncontinuous basis performs work which is either not an integral part of the regular business of the beneficiary of the work or which is not the . . . regular business, profession, or occupation of the worker. . . ." This definition seems to apply to the work on the shed.

The Commission, when listing its view of what the evidence showed, wrote that Amos's work on the shop "was both transient and part-time." The Commission did not provide any further explanation for these conclusions.

> Amos contends the Commission's "finding[] that Amos's work was 'both transient and part-time' is not supported by substantial evidence." Amos argues the regulatory definitions do not apply to him because he "cannot be characterized as transient" and his work "was an integral part of Tidwell's regular handyman side-job work." According to Amos, "[s]ubstantial evidence supports the finding that Amos was not 'part-time' help" and also "supports a finding that construction was [his] regular job." Tidwell's brief repeats the Commission's decision, making only minor alterations to the citations. The Fund does not address this argument.

---

the beneficiary of the work or which is not the regular business, profession, or occupation of the worker;

(2) "transient help" means a person who does not have a permanent work residence and who performs work which is not an integral part of the regular business of the beneficiary of the work.

The Commission's use of AS 23.30.230(a)(3) and 8 AAC 45.900 presents important legal issues that we do not address because the parties did not raise them.[83] But it was error for the Commission to apply, whether speculatively or otherwise, a statute and regulation that require factual findings when Amos contested their applicability before the Board and the Board did not apply them or make any findings related to them.[84]

As set out in section IV.A of this opinion, the Board, not the Commission, is the agency within the workers' compensation system tasked with making findings of fact related to claims. The Commission cannot, under its own precedent, make findings of fact based on evidence presented to the Board if the Board did not do so.[85] Both regulatory subsections the Commission cited require findings, although some factors clearly overlap. For example, the regulation requires findings about the beneficiary of Amos's work, and that person's "regular business."[86] In its short discussion of the regulation, the Commission did not point to any findings the Board made that supported applying the regulation or the statute. The Commission instead substituted its own view of what the evidence showed to reach a legal conclusion about the regulation's

---

[83] For example, does the statutory language limit the occupations to which the regulation applies? *See Schultz v. Hinchey*, AWCB Dec. No. 19-0120, 2019 WL 6307569, at *11 (Nov. 19, 2019) (construing AS 23.30.230 and 8 AAC 45.900(c)(1) as applying only to babysitting or work similar to harvest help). Did the repeal and reenactment of AS 23.30.230 in 1986, ch. 47, § 1, SLA 1986, affect the regulation, which was promulgated in 1983, *see* 8 AAC Register 86 (July 1983), and if so, how?

[84] Because the Board did not make findings related to the regulation, we do not address Amos's arguments about substantial evidence. We use substantial evidence review to evaluate whether the Commission's legal conclusions about substantial evidence supporting the Board decision are correct by evaluating the Board's decision. *Smith v. CSK Auto, Inc.*, 204 P.3d 1001, 1007 (Alaska 2009).

[85] *Marsh Creek, LLC v. Benston*, AWCAC Dec. No. 101, at 23 n.49 (Mar. 13, 2009), https://labor.alaska.gov/WCcomm/memos-finals/D_101.pdf.

[86] 8 AAC 45.900(c).

applicability.  This was error.  We therefore reverse the Commission's speculation that Amos's work on the shop project "was both transient and part time."

## V. CONCLUSION

We REVERSE the Commission's decision and REMAND to the agencies for further proceedings consistent with this opinion.