NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| JENNIFER FLETCHER,<br><br>                  Appellant,<br><br>    v.<br><br>PIKE'S ON THE RIVER, INC. and<br>REPUBLIC INDEMNITY COMPANY<br>OF AMERICA,<br><br>                  Appellees. | Supreme Court No. S-18861<br><br>Alaska Workers' Compensation Appeals<br>Commission No. 22-008<br><br>MEMORANDUM OPINION<br>AND JUDGMENT[*]<br><br>No. 2087 – April 23, 2025 |

Appeal from the Alaska Workers' Compensation Appeals Commission.

Appearances: Jennifer Fletcher, pro se, West Bend, Wisconsin, Appellant. Vicki A. Paddock, Meshke Paddock & Budzinski, Anchorage, for Appellees.

Before: Carney, Borghesan, Henderson, and Pate, Justices. [Maassen, Chief Justice, not participating.]

## I. INTRODUCTION

A server at a restaurant was injured on the job when she fell down some stairs, but she was able to return to work several weeks later. The server was treated for pain, mostly through massage and physical therapy, for more than five years while

---

[*] Entered under Alaska Appellate Rule 214.

continuing to work a variety of jobs. The server sought workers' compensation medical coverage for her injuries.

The Alaska Workers' Compensation Board resolved discovery and evidentiary disputes against her and later denied her claim after a hearing on the merits. The Alaska Workers' Compensation Appeals Commission affirmed the Board's decision. We affirm the Commission's decision because substantial evidence in the record supports the Board's decision and because any procedural errors the agencies may have made were harmless.

## II.   FACTS AND PROCEEDINGS

### A.   Facts

Jennifer Fletcher worked at Pike's Landing, a restaurant in Fairbanks. While Fletcher was "preparing for service" on the morning of July 19, 2013, her left foot slipped off the end of a step, and she fell down two steps onto a cement floor, injuring both knees, both ankles, and her right arm and side. Initially she treated the injuries at home, using "ice, ibuprofen, and an Ace-brand wrap." After about a week, Fletcher went to a healthcare provider who instructed her not to work for one week and prescribed medication. The provider's notes identified pain in Fletcher's right shoulder, right upper arm and forearm, both lower legs, both ankles, and both knees. The provider wrote that Fletcher "had a big injury that caused swelling and pain into multiple joints from her fall."

Pike's filed a report of injury with the Board and paid Fletcher a small amount of temporary disability. Pike's stopped disability payments on August 9 after Fletcher's health care provider said that she could return to work on August 10 "with no restrictions." On August 16 the same provider gave Fletcher two return-to-work notes, both with restrictions that limited her to no more than four hours of standing and

restricted her use of stairs.[1]  She returned to work at Pike's on August 11 and was referred to physical therapy shortly thereafter.

Fletcher's job at Pike's ended in September.  Fletcher and Pike's disputed whether she had been laid off (as her seasonal employment had ended) or quit.  She also returned to work at her other job as a substitute teacher for a short time.  She went to physical therapy for about a month, but in October moved from Fairbanks to Wisconsin to be closer to family.  The physical therapy notes from Fairbanks show that at the time of her discharge her symptoms had not improved.

After arriving in Wisconsin, Fletcher consulted with Tara Ferris, a physician assistant, who prescribed medication and referred her to physical therapy.  The notes from Fletcher's first visit to Ferris in December say, "[Fletcher] cannot identify any specific problems with her right shoulder or arm and is using her upper extremities without difficulty."  The physical exam indicated that her knees had "full [range of motion] with respect to flexion and extension bilaterally," with no evidence of swelling.  Ferris cleared Fletcher to work with certain restrictions.

In January 2014 Ferris wrote to Pike's insurance adjuster with a diagnosis of knee, ankle, and hip pain; she did not mention any concerns about Fletcher's shoulder.  Later that same month, Pike's formally controverted disability benefits, stating that Fletcher had been "released to light duty work by her physician," "voluntarily resigned" her job, and moved to another state.  For the next six to seven months Fletcher saw Ferris every four to six weeks and attended physical therapy regularly.

---

[1]    Two work-release forms signed the same day by the same provider gave conflicting restrictions about the total hours per day that Fletcher could work.

In July, about a year after the injury, Pike's arranged for Fletcher to attend an employer's medical examination (EME) with Dr. John Swanson.[2] Dr. Swanson's report concluded Fletcher had suffered only a sprain injury to her ankle and other mild injuries to her knee and hip in connection with her fall at Pike's; he thought the injuries had resolved or at least were medically stable[3] by the time he examined her. He did not identify any upper body problems in his report. He further stated that the work-related injury was not the substantial cause of any medical care Fletcher was then receiving, that the ongoing medical treatment was neither reasonable nor necessary for treating her injury, that Fletcher would have no permanent impairment related to the injury, that she might benefit from further evaluation for some possible conditions unrelated to work, and that Fletcher could return to work as a server. Citing to Dr. Swanson's EME report as justification, Pike's filed a controversion of all benefits later that month.

Fletcher continued to receive treatment in Wisconsin for her injuries. The record indicates she was going to physical therapy about twice a month starting in 2015 and continuing for years.[4] A chart note from August 2015 indicates that "[t]he quality and character [of her pain] has not really changed at all, but she feels she has improved since the time of her injury, although she cannot quantify it."

---

[2] Alaska Statute 23.30.095(e) requires an injured employee to "submit to an examination by a physician . . . of the employer's choice authorized to practice medicine under the laws of the jurisdiction in which the examination occurs."

[3] "Medical stability" is defined as "the date after which further objectively measurable improvement from the effects of the compensable injury is not reasonably expected to result from additional medical care or treatment, notwithstanding the possible need for additional medical care"; medical stability is "presumed in the absence of objectively measurable improvement for a period of 45 days; this presumption may be rebutted by clear and convincing evidence." AS 23.30.395(28).

[4] At a Board hearing in 2022, Fletcher's physical therapist agreed that she had seen Fletcher "about 239" times.

While in Wisconsin, Fletcher worked primarily as a substitute teacher or teacher's aide, but she also worked at other part-time jobs, like babysitting. Her healthcare providers set work restrictions, which remained essentially the same, from 2013 through 2016.

In 2018 Fletcher saw Dr. Henry Alba, a physiatrist, who recommended that Fletcher get an MRI of her right shoulder. In 2021 MRI results confirmed Dr. Alba's suspicion that Fletcher had a labral tear. Dr. Alba attributed the tear to her work-related injury. Fletcher consulted with a surgeon about repairing the tear. At the time of the Board hearing in 2022, Fletcher continued to go to physical therapy but had not yet had shoulder surgery.

### B. Proceedings

In January 2016 Fletcher filed a written workers' compensation claim, initially seeking temporary partial disability benefits from August 9, 2013, and continuing forward. Fletcher later amended the claim to include medical and transportation costs and, even later, to include temporary total disability, permanent partial impairment, a compensation rate adjustment, a finding of unfair or frivolous controversion, interest, a penalty, and "filing costs."

Fletcher requested a second independent medical evaluation (SIME) in June 2018. By July 2019 Pike's no longer opposed the SIME. The SIME doctor, Dr. Marvin Zwerin, examined Fletcher and reviewed medical records. He considered Fletcher's continued physical therapy to be palliative[5] rather than curative and thought it was ineffective as well. He did not think the physical therapy was reasonable or

---

[5] "Palliative care" is defined as "medical care or treatment rendered to reduce or moderate temporarily the intensity of pain caused by an otherwise stable medical condition, but does not include those medical services rendered to diagnose, heal, or permanently alleviate or eliminate a medical condition." AS 23.30.395(29). Alaska Statute 23.30.095(o) limits employer liability for palliative care after the date of medical stability.

necessary for treating the injuries from the work-related injury. He opined that the date of medical stability was July 14, 2015, because Fletcher had suffered soft tissue injuries, and those sorts of injuries always resolve within two years.

In March 2019 Fletcher asked the Board to "preclude" Pike's from using Dr. Swanson's EME report and any testimony related to it. She argued that Dr. Swanson offered opinions in areas that were outside his expertise and also contended that his opinions lacked foundation and were speculative. Fletcher sought discovery about Dr. Swanson's opinions in other workers' compensation cases, listing multiple decisions in which the Board decided that Dr. Swanson was not credible, was not an expert in certain fields, or had rendered opinions that were entitled to little weight. She wanted the Board to order Pike's to provide Dr. Swanson's EME reports from these other cases because she thought the reports might show that he had merely cut and pasted text from earlier EMEs when he prepared his report about her injury. She proposed redacting the names and identifying details of the subjects of the earlier reports. After Pike's objected to her request because the information was not in its possession, Fletcher moved the Board to compel responses.

Both her motion to compel discovery and her request to preclude Dr. Swanson's testimony were denied at a prehearing conference in August 2019.[6] Fletcher appealed the prehearing conference decision to the Board; the Board affirmed it in November.

Dr. Swanson was deposed in December 2021. He testified that he had at one time treated patients in his practice but in 2001 began practicing "forensic

---

[6] Workers' compensation discovery disputes are first decided at a prehearing conference; the decision of the prehearing conference officer can be appealed to the Board, but hearings on discovery disputes are limited to the same written record that was before the prehearing conference officer. *See* AS 23.30.108(c); 8 Alaska Administrative Code (AAC) 45.065(h)-(i).

orthopedics, occupational orthopedics performing independent medical examinations." He summarized briefly the process he used when he examined Fletcher in 2014 and indicated that he still held the opinions he gave in the EME report. He testified he had reviewed Dr. Zwerin's SIME report; his only disagreement with it was the date of medical stability. Dr. Swanson thought that any soft tissue injuries would have been medically stable within a year rather than two, as Dr. Zwerin opined, because any biochemical processes for healing would have ended by the end of the first year.

Dr. Swanson also testified about medical records concerning Fletcher's right shoulder. He disagreed with Dr. Alba's causation opinion: Dr. Swanson did not think the work-related injury could be the cause of the labral tear because Fletcher's medical records from shortly after the fall did not show any abnormal range of motion. He testified that if she had torn her labrum when she fell at work, there would have been some physical signs on examination. He thought a referral to an orthopedist was reasonable for treating the right shoulder, but he did not think the treatment was related to the injury that Fletcher sustained while working at Pike's.

Fletcher's cross-examination of Dr. Swanson referred to a number of Board decisions in other cases, in which the employer had used Dr. Swanson's opinion to controvert benefits and the Board had subsequently given his opinion little weight. Dr. Swanson testified that he did not recall any of those cases and that he had no idea either what use the employer made of his evaluation or how the Board used the opinion.

Shortly before the Board held a hearing on the merits of the claim, Fletcher asked the Board to preclude Dr. Swanson from offering opinions that were beyond his expertise. The Board did not exclude the testimony.

The Board held a hearing on Fletcher's claim in February 2022. Fletcher called her physical therapist, Kathleen Pape, as a witness, and Fletcher also testified. Pike's did not present any witnesses. Pape thought Fletcher had been making progress

over the years.  When Pike's asked Pape to identify "objective improvements" that Fletcher made after July 9, 2014, she responded:

> [Fletcher] now was able to weight shift through her legs and standing equally and weight shift through her pelvis . . . . She has neutral mechanics of the pelvis at this time, she has range of motion in the ankle, which is more normal on the right.  She has the ability to extend her hip on the right side, her laying flat with a straight leg and for walking, didn't have a posterior stride.  She has motion through the ankle to provide a push off through to the right.  She has range of motion in the right shoulder, which is . . . external location to allow her to raise her arm overhead without impinging the rotator cuff muscles.

Pape said that Fletcher's pain complaints in her "lower quarters" had decreased since 2014 but complaints about her "upper quarters" had "in some ways[] increased."  She also indicated that some routine activities such as handling paperwork or using stairs would aggravate Fletcher's symptoms.

Fletcher had been deposed earlier, so her hearing testimony was brief.  She testified about the jobs she had held and explained how the work-related injury and her continuing pain impacted her ability to perform work tasks.  She answered questions related to her income level and the unemployment benefits she had received after the injury.

The Board considered whether she was entitled to medical care and related transportation benefits after the July 2014 controversion and decided she was not.  It decided Fletcher was not credible and denied all her claims.  The Board gave little or no weight to the opinions of Fletcher's healthcare providers, in part because the Board said they relied on Fletcher's self-reports, which the Board considered not credible.  It found that Pape's responses at the hearing were "evasive and unspecific" and pointed out what it considered to be contradictions in her treatment records.  The Board gave more weight to the opinions of Dr. Zwerin and Dr. Swanson, and it gave the most weight to Dr. Swanson's opinion about the date of medical stability.  The Board cited Dr.

Zwerin's opinion that Fletcher's perceived need for physical therapy, which he considered palliative, was caused by her ongoing work as a substitute teacher and was not a result of the injury at Pike's. In the end, the Board decided that Fletcher had not proven her claim for medical care and transportation costs by a preponderance of the evidence.

With respect to disability benefits, the Board decided that it was "undisputed that [Fletcher] was not totally disabled," noting that she had returned to some work before she left Fairbanks in 2013. The Board used its presumption analysis[7] to evaluate Fletcher's entitlement to temporary partial disability benefits, which would have ended on July 14, 2014, the date the Board determined Fletcher was medically stable.[8] The Board said Fletcher "submitted no evidence showing a diminished earning capacity following the work[-related] injury such that [temporary partial disability] could be awarded." The Board denied Fletcher's permanent partial impairment claim because she did not provide any evidence to contradict Dr. Swanson's and Dr. Zwerin's opinions that she did not have a ratable permanent impairment.[9] The Board rejected her other claims as well.

---

**7** *See Huit v. Ashwater Burns, Inc.*, 372 P.3d 904, 906-07 (Alaska 2016) (summarizing pre-2005 presumption analysis); *Morrison v. Alaska Interstate Constr. Inc.*, 440 P.3d 224, 232, 237-39 (Alaska 2019) (construing 2005 amendments' change to three-step analysis). The three-step presumption analysis applies to all factual questions underlying an employee's entitlement to benefits. *Sokolowski v. Best W. Golden Lion Hotel*, 813 P.2d 286, 292 (Alaska 1991).

**8** *See* AS 23.30.200(a) ("Temporary partial disability benefits may not be paid for a period of disability occurring after the date of medical stability.").

**9** Pursuant to AS 23.30.190, permanent partial impairment is awarded only when a permanent impairment exists under the guidelines in the American Medical Association Guides to the Evaluation of Permanent Impairment. Dr. Swanson used this reference and concluded that Fletcher's injuries resulted in a 0% impairment. Dr. Zwerin also concluded she had a 0% impairment.

Fletcher appealed to the Commission, which affirmed the Board's decision, concluding that substantial evidence in the record supported the Board's decision.

Fletcher appeals.

## III. STANDARD OF REVIEW

"In an appeal from the Commission, we review the Commission's decision and not the Board's."[10] We independently review the Commission's legal conclusion that the Board's factual findings were supported by substantial evidence.[11] We also independently review the Commission's legal conclusions about the Board's exercise of discretion by directly reviewing the Board's decision and applying the applicable standard of review.[12] We review the Board's discovery decisions[13] as well as its decisions to admit evidence for abuse of discretion.[14] We review the Board's application of its regulations to the facts of a case for abuse of discretion.[15] "Waiver is a legal issue that this court reviews de novo . . . ."[16]

## IV. DISCUSSION

Fletcher's arguments before us are chiefly related to the Board's denial of her request to exclude Dr. Swanson's EME report and his subsequent deposition

---

[10] *Mitchell v. United Parcel Serv.*, 498 P.3d 1029, 1039 (Alaska 2021) (quoting *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1121 (Alaska 2017)).

[11] *Smith v. CSK Auto, Inc.*, 204 P.3d 1001, 1007 (Alaska 2009).

[12] *Id.*

[13] *Dougan v. Aurora Elec. Inc.*, 50 P.3d 789, 793 (Alaska 2002).

[14] *See AT&T ALASCOM v. Orchitt*, 161 P.3d 1232, 1243 (Alaska 2007) (holding that Board "acted within its discretion" by admitting expert testimony).

[15] *Id.* at 1246.

[16] *State v. Jacob*, 214 P.3d 353, 361 (Alaska 2009) (reviewing de novo whether claimants had adequately asked for enhanced fees in superior court).

testimony from evidence. Her arguments tend to focus on her medical care rather than on disability benefits. She contends that (1) Dr. Swanson offered opinions beyond his expertise as an orthopedist; (2) he "misdiagnosed" her "earlier knee operation"; and (3) some of his opinions lacked foundation. She claims the Board erred when it treated these issues as going to the weight it should give to Dr. Swanson's report and testimony rather than to their admissibility. Fletcher also argues that the Board abused its discretion by denying a discovery petition she had filed in order to obtain information to use in cross-examining Dr. Swanson, and that the Commission erred by failing to address the denial of the petition. Fletcher maintains that the Board was required to make an explicit finding about Dr. Swanson's credibility even though the Board gave his report "the most weight" of any of the medical evidence. Finally, Fletcher identifies two statements of "material facts" from the Commission's decision that she contends are "wrong." Fletcher seeks a remand to the agencies for further proceedings.

Pike's responds that substantial evidence in the record supports the denial of Fletcher's claim. It asserts that Fletcher waived consideration of many of the arguments in her briefing to us and that even if she did not, the Board did not abuse its discretion in its rulings. As a result, Pike's argues, the Commission's decision should be affirmed.

### A. The Board Did Not Abuse Its Discretion By Denying Fletcher's Petition To Preclude Dr. Swanson's Report And Testimony Or By Denying Her Motion To Compel Discovery.

In March 2019, more than three years after Pike's filed Dr. Swanson's EME report with the Board, Fletcher asked the Board to "preclude" the use of the report "and any future related testimony." She argued that Dr. Swanson gave opinions that were beyond his expertise or were speculative. A prehearing conference officer denied this request because the EME report "is the sort of evidence [a] panel must weigh and consider" to resolve the merits of Fletcher's claim. The officer also stated that the report did not meet the standard for exclusion in 8 AAC 45.120, which is the Board's

regulation governing the admissibility of written evidence.[17]  In its review of the prehearing decision, the Board agreed, writing that the EME report was "directly relevant to the determination of . . . benefits in this case."  The Board also noted that Pike's had "represented it [would] make Dr. Swanson available" for cross-examination.[18]

Fletcher acknowledges that Dr. Swanson is an orthopedic physician, but she argues here that "Dr. Swanson's report and deposition are peppered with opinions he was not qualified to give" in medical specialties like psychiatry.  She does not explain how this allegation, even if proven true, would undermine Dr. Swanson's opinion about her orthopedic injuries to the point that the entirety of his report and testimony should be excluded.  She also alleges that Dr. Swanson's "misdiagnosis" of an earlier knee surgery — he thought she had prior arthroscopic surgery on her right knee rather than

---

[17]    8 AAC 45.120 provides in pertinent part:

(e) Technical rules relating to evidence and witnesses do not apply in board proceedings, except as provided in this chapter.  Any relevant evidence is admissible if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of such evidence over objection in civil actions. . . .    Irrelevant or unduly repetitious evidence may be excluded on those grounds.

(f) Any document . . . that is served upon the parties, accompanied by proof of service, and that is in the board's possession 20 or more days before hearing, will, in the board's discretion, be relied upon by the board in reaching a decision . . . .

[18]    *See* 8 AAC 45.052 (setting out process to request cross-examination related to medical reports); *see also Com. Union Cos. v. Smallwood*, 550 P.2d 1261, 1264-68 (Alaska 1976) (discussing right to cross-examine authors of written medical reports).

her left knee — "called into question the legitimacy of [his] evaluation of the injury to Fletcher's knee" as well as "other representations in his report."

Pike's contends that the Commission appropriately declined to review the Board's earlier interlocutory decisions denying Fletcher's petition to preclude Dr. Swanson's report and her motion to compel because Fletcher "did not seek review or appeal" of the earlier Board decisions and thus waived consideration of them. According to Pike's, Fletcher waived any consideration of issues decided in interlocutory Board decisions by failing to "appeal to the Commission," even though the Board decision in question plainly stated that it was "interlocutory" and thus, under AS 23.30.007(a)[19] and the Commission's regulations,[20] could not be appealed as a matter of right. On the merits of the issue, Pike's alternatively argues that the EME report was admissible under the Board's regulations, so the Board did not abuse its discretion when it refused to "preclude" use of Dr. Swanson's report and testimony.

The Commission refused to address these issues because "[n]one of [the Board's interlocutory] decisions were appealed to the Commission, nor were these decisions revisited by the Board" in the final decision on the merits. But Fletcher did not need to petition for the Commission's review in order to preserve these issues for later review because, under Commission precedent, issues in interlocutory decisions are

---

[19]    Alaska Statute 23.30.007(a) provides in part, "The commission has jurisdiction to hear appeals from final decisions and orders of the board . . . ."

[20]    *See* 8 AAC 57.010 (distinguishing "appeals of final decisions and orders of the board" and "petitions for review of interlocutory and other non-final decisions and orders of the board"); *see also* 8 AAC 57.020 (identifying parties in an appeal of "a final decision or order of the board"); 8 AAC 57.075(a) (setting deadline for petition for review of "an interlocutory or other non-final board decision or order").

subject to review in a later appeal from a final Board decision.[21]  Nor does any Commission regulation require a party to seek interlocutory review to preserve an issue.

Even though the Commission's rationale for refusing to consider the interlocutory decision was incorrect, any error was harmless.  The Board did nothing improper by denying Fletcher's petition to preclude the use of Dr. Swanson's report and testimony.  As the Board determined, Pike's submitted the report in the manner prescribed by the Board's regulations,[22] and Fletcher had the opportunity to cross-examine Dr. Swanson about the report and his possible bias.  Applying the Board's regulations, the Board could properly consider the report in making its decision because it was directly relevant to the Board's evaluation of Fletcher's claim.[23]

Moreover, Fletcher mischaracterizes the report.  Dr. Swanson did not diagnose Fletcher with either a psychiatric or a substance abuse issue; he recommended that she be evaluated by professionals with the expertise to make these diagnoses because his examination of her raised concerns.  Doctors may perform screening that is outside their specialty based on their general medical training.[24]  And due to the importance of pain complaints in determining appropriate orthopedic treatment,

---

[21]    *See J.C. Mktg. v. You Don't Know Jack, Inc.*, AWCAC Dec. No. 132, at 10 (Mar. 30, 2010) ("This denial is not a determination that the board did not err and does not affect the parties' rights to appeal from a final board decision."), https://labor.alaska.gov/WCcomm/memos-finals/D_132.pdf; *see also Pac. Log & Lumber v. Carrell*, AWCAC Dec. No. 47, at 7-8 (June 29, 2007) (setting out procedure after denial of petition for extraordinary review, including "reserv[ing] the issues for appeal after a final decision is made by the board on the employee's claim"), https://labor.alaska.gov/WCcomm/memos-finals/F_07-047.pdf.

[22]    *See* 8 AAC 45.120(f).

[23]    *See* 8 AAC 45.120(e).

[24]    *See* 6 Clifford S. Fishman et al, Jones on Evidence, § 52:18 (7th ed. 2024) (defining "differential diagnosis" as "a process whereby medical experts seek to determine what caused a person's illness when a clear cause is not evident").

orthopedic physicians perform tests to ascertain the validity of patients' pain complaints, as Dr. Swanson did here. Dr. Swanson was clearly able to provide an expert opinion about the central issues in Fletcher's claim because her injuries were musculoskeletal, which fall within the purview of his expertise as an orthopedic physician.

We likewise find no merit in Fletcher's claim that Dr. Swanson's failure to correctly identify the knee on which she had surgery somehow made his report inadmissible.[25] Fletcher refused to answer Dr. Swanson's questions about a prior knee surgery mentioned in one medical record and told him she could not recall if she had suffered any sports injuries. In any event, her argument that his "sloppiness" in failing to identify the correct knee made the report suspect is an argument that goes to the weight of the evidence, not its admissibility.[26]

Fletcher also contends that the Board erred by not granting her motion to compel discovery related to Dr. Swanson's testimony and reports from other workers' compensation cases. Pike's responds that Fletcher failed to preserve this issue for our review because she did not raise it in her appeal to the Commission. In reply Fletcher provides record cites to argue that she in fact sought Commission review of this discovery dispute, but the cites she provides deal with her request to preclude the use of Dr. Swanson's report and testimony, not with her motion to compel discovery. We

---

[25]     According to Fletcher's deposition testimony, she had arthroscopic surgery on her left knee following a sports injury "over 30 years ago."

[26]     *See Smith v. University of Alaska, Fairbanks*, 172 P.3d 782, 793 (Alaska 2007) (holding that findings related to weight are within province of fact-finder, which is Board in workers' compensation cases).

therefore agree with Pike's that Fletcher has waived the issue because it was not preserved for our review.[27]

But even if the discovery issue had been preserved, it lacks merit. Fletcher's motion to compel sought documents that were not in Pike's possession or control.[28] Setting aside the inapplicability of formal discovery rules to workers' compensation proceedings,[29] requests for production of documents served on a party are limited to documents that are "in the possession, custody, or control" of the party.[30] Dr. Swanson's testimony and reports in other cases were not "in the possession, custody, or control" of Pike's. The Board did not abuse its discretion when it denied Fletcher's motion to compel discovery.

**B.     The Commission Correctly Concluded That Substantial Evidence In The Record Supported The Board's Decision.**

The Commission concluded that substantial evidence in the record supported the Board's decision to deny Fletcher's claim for medical care. Fletcher's only claims of error in terms of factual findings are related to two statements that she asserts the Board and Commission "got wrong." Pike's responds that substantial evidence supports the agency decisions.

We agree with Pike's and hold that substantial evidence in the record supports the agency decisions. Because we have rejected Fletcher's arguments about

---

[27]     *See Wagner v. Stuckagain Heights*, 926 P.2d 456, 459 (Alaska 1996).

[28]     Fletcher claims she merely sought information, not documents, but her Motion to Compel Discovery said, "Fletcher has a substantial need for the documents she seeks." She asked Pike's to provide "[a]ll EME reports that Dr. Swanson prepared during the previous six years" and "[a]ll transcripts of testimony Dr. Swanson has given in worker's compensation cases during the previous six years."

[29]     *State, Dep't of Health & Soc. Servs. v. White*, 529 P.3d 534, 546 (Alaska 2023) (citing AS 23.30.135(a)).

[30]     Alaska R. Civ. P. 34(a).

the Board's denial of her discovery requests and her attempts to exclude Dr. Swanson's report and testimony, Dr. Swanson's report and testimony were properly before the Board and thus can be credited as evidence supporting the Board's decision.

The Board decided here to give the most weight to Dr. Swanson's opinions. As the Commission recognized, the Board is the agency with "the sole power to determine the credibility of a witness."[31] Alaska Statute 23.30.122 provides that the Board's finding "concerning the weight to be accorded a witness's testimony, including medical testimony and reports, is conclusive even if the evidence is conflicting or susceptible to contrary conclusions." The Board gave substantial weight to the opinions of Dr. Swanson and Dr. Zwerin, and it gave the most weight to Dr. Swanson's opinion about medical stability, which was the only significant disagreement between the two doctors. This evidence is substantial because it is "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion."[32]

Dr. Swanson opined that Fletcher's work-related injury was medically stable by July 14, 2014, the date he examined her; he also testified that any medical care she was receiving after this date was not reasonable or necessary to treat her work-related injuries. These opinions provided the Board with a basis to deny Fletcher's claims for medical care after July 14, 2014.[33]

Fletcher argues that her case should be remanded to the Board because the Board did not make an explicit finding regarding Dr. Swanson's credibility. We reject

---

[31] AS 23.30.122.

[32] *Weaver v. ASRC Fed. Holding Co.*, 464 P.3d 1242, 1252 (Alaska 2020) (quoting *Humphrey v. Lowe's Home Improvement Warehouse, Inc.*, 337 P.3d 1174, 1179 (Alaska 2014)).

[33] Fletcher has not provided any argument specific to her claims for temporary partial (or total) disability benefits, permanent partial impairment, a compensation rate adjustment, interest, penalty, a finding of unfair or frivolous controversion, or "filing costs," so we do not address them separately.

this claim and agree with Pike's reasoning that the Board's decision to give Dr. Swanson's opinion the most weight necessarily implies that the Board found his opinions credible, or at the least the most credible among the opinions presented to it.

We likewise reject Fletcher's argument that the agencies' decisions contain "material facts that the record affirmatively demonstrates" are incorrect. She points to two statements. But in both instances she takes the statement out of context, omitting parts of the sentences she quotes. The Commission, summarizing Fletcher's visit to Ferris on December 30, 2013, wrote, "Ms. Fletcher did not report any specific problems with her right shoulder or right arm, and she was using her upper extremities without difficulty." Fletcher contends this is mistaken because "[s]he reported pain in her right shoulder to each of her physicians." But Ferris's notes from the visit say, "[Fletcher] cannot identify any specific problems with her right shoulder or arm and is using her upper extremities without difficulty." Given how closely the Commission's decision follows the notes, it made no material factual mistake.

Fletcher alleges, "The Board also said that Fletcher's treating physicians did not base their diagnoses and decisions upon an 'independent review of her [Alaska] medical records,' " (alteration in original) although she cites the Commission's decision rather than the Board's. The Commission in fact wrote that Drs. Swanson and Zwerin "had access to Ms. Fletcher's full medical record" and that they, "unlike her treating medical providers, did not base their diagnoses and decisions on her incredible statements to them, but rather on their independent review of her medical records and their evaluations and examinations of her." In light of the Board's finding that Fletcher was not credible and its related finding that her lack of credibility rendered her treating physicians' opinions not credible because they relied on her self-reports, the Commission's consideration of this issue was not based on any material factual mistake.

## V.  CONCLUSION

We AFFIRM the Commission's decision.